UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC., | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 06-2034 RWR |
| SOCIAL SECURITY ADMINIS-TRATION, | ) |
| Defendant. | ) |

MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff has opposed defendant's motion for summary judg-ment and has filed a cross-motion for summary judgment in its favor. As we explain below, the grounds advanced by plaintiff are not meritorious. Plaintiff's motion for summary judgment should be denied, and defendant's motion for summary judgment should be granted.

Plaintiff's Freedom of Information Act ("FOIA") request sought (for the time period January 1, 2001, to the present) any listing by defendant of the top 100 employers (or any other listing of such "top" employers, e.g., the top 10 or top 50) in terms of "no matches" between the names and/or social security numbers reported on IRS Forms W-2 and the records maintained by defendant. Employers file IRS Forms W-2 and W-3 with the Social Security Administration (SSA) acting on behalf of the IRS. SSA

1

then provides the information to the IRS.  Because defendant receives the returns on behalf of the IRS, it considers them to be from the IRS.

Summary of Argument

The lists sought by plaintiff would identify by name and address the top 100 employers in terms of number of "no matches" in the W-2 forms submitted by the employer.  As we explain below, these lists contain "return" and "return information" and are exempt from disclosure under FOIA's Exemption 3.

Additionally, plaintiff cites Davis, Cowell & Bowe, LLP v. Social Security Administration, 281 F.Supp. 1151 (N.D.Cal. 2003) for the proposition that the Social Security Administration has taken the position that information of the same type that plaintiff seeks could be released, i.e., the release of the information would not violate 26 U.S.C. § 6103.  The case cited by plaintiff is inapposite, since that case did not involve the filing of W-2 and W-3 forms.  What the case involved was the Social Security Administration's Social Security Number Verification Service (SSNVS), not the Annual Wage Reporting (AWR) process that is at issue in the instant case.

Plaintiff argues that defendant did not perform an adequate search for responsive records, relying in large part on defendant's statement that it was not required to search for documents that, if they exist, would be exempt from disclosure under the FOIA.  Defendant adheres to that position, but counsel for defendant also believed that there were no lists, created post-

-2-

January 1, 2001, that were responsive to plaintiff's request,
other than the one that has already been identified to plaintiff.
As explained below, this requires some modification, in that
SSA's Office of Inspector General may have created such lists
after the cutoff-date but such lists did not extend beyond the
2001 tax year.  The lists, derived from the AWR data, are exempt
from disclosure, as explained below.

Plaintiff argues that defendant, if it is ordered to produce
the requested data, should be required to prepare computerized
listings of the top 100 employers per year in terms of "no
matches."  As authority for this proposition, plaintiff cites the
Electronic Freedom of Information Act Amendments of 1996.  This
argument is based on a misunderstanding of the obligations im-
posed on agencies by the 1996 amendments.  These amendments do
not require an agency to prepare a complicated computer program
that would manipulate the computerized data it has and extract
from such data the information sought by a FOIA requester in the
format requested by the requester.

<u>Argument</u>

A. <u>The Data Sought By Plaintiff Is Exempt From Disclosure By
Exemption 3 Of The FOIA.</u>  It is undisputed that the Internal
Revenue Code has a strong confidentiality provision, 26 U.S.C. §
6103, that generally precludes the release of "return" and
"return information."  It is also undisputed that this statute
qualifies as an Exemption 3 statute, under which the information
subject to the statute is exempt from disclosure under the FOIA.

Plaintiff argues, however, that the information it seeks is not covered by § 6103 because it is not seeking "return" or "return information," and the statutory provision therefore does not apply to the data that it seeks.

Plaintiff's analysis of § 6103 cannot withstand close scrutiny.  The listing of employers (by name and address) with the most "no matches" in the W-2 information returns that they file is statutorily-protected information.  Employers have obligations under the Internal Revenue Code to file W-2 forms (by means of the W-3 transmittal form) with the Social Security Administration, and they face penalties for failing to do so. Hence, they are "taxpayers" and identifying them is a disclosure of a "taxpayers identity" as defined in § 6103(b)(6).  The W-2 information they file is also an information return under 26 U.S.C. § 6301(b)(2)(A), which defines such a return broadly as including, inter alia,

> any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determin-ation of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

Under the Supreme Court's ruling in Church of Scientology of California v. Internal Revenue Service, 484 U.S. 9 (1987), in-formation that qualifies under § 6103 cannot be produced under the FOIA even in redacted form, i.e., after the deletion of the information that would identify the person providing the return or return information.  The only form in which such information

-4-

can be included is as a statistical compilation of data that does not directly or indirectly identify a particular taxpayer. 484 U.S. at 16 (citing Senator Haskel's comments on the floor of the Senate). A list of the top employers by name and address in terms of number of "no matches" does not meet this legal standard.

B. The Case of Davis, Cowell & Bowe, Did Not Involve Returns Or Return Information And Is Not Inconsistent With The Agency's Position In This Case. Plaintiff argues that defendant took the position in Davis, Cowell & Bowe, LLP v. Social Security Administration, 281 F.Supp. 1151 (N.D.Cal. 2003), that the release of information of the type sought by plaintiff in this case did not violate 26 U.S.C. § 6103. Although the case, the decision in which was vacated on grounds of mootness, is not binding on the agency, there is in fact no disparity between the position taken there and the position that it takes in this case.

The plaintiff in Davis filed a FOIA request with defendant that asked for all

> records reflecting communications between SSA and two employers, including inquiries made to the SSA by these employers about their employee's [sic] social security numbers, the SSA's response to these inquiries, and notices from the SSA to the employers that social security numbers on their wage reports did not match the corresponding employee's name, date of birth, and/sex.

281 F.Supp.2d at 1154.

The district court granted summary judgment to the agency on the ground that the records sought by plaintiff were taken from

-5-

W-2 and W-3 forms and constituted tax return information that was
confidential under 26 U.S.C. § 6103.  Thereafter, SSA advised the
plaintiff that there were in fact no records responsive to the
FOIA request.  The parties then settled the case, and the summary
judgment decision was vacated as being moot.  In the course of
that process, the SSA represented that the IRS had changed its
policy and would no longer argue that the social security infor-
mation sought in the Davis case was tax information.

The absence of responsive records in the Davis case is, at
first glance, puzzling, since employers are required to file
annually IRS forms W-2 and W-3.  There is, however, an explana-
tion that solves this puzzle and that reconciles the position
taken by the agency in that case with the position being taken in
this case.  Undersigned counsel has been advised by SSA that the
Davis case involved a FOIA request for information that was
supplied to the agency under its SSNVS (Social Security Number
Verification System), not the AWR (Annual Wage Reporting)
process.  Attached hereto as Exhibit A is a second declaration by
Charles Liptz, the Director of SSA's Employer Wage Reporting and
Relations Staff.  The declaration explains that the SSNVS is a
voluntary process that can be used by employers to match their
records of employees' names and social security numbers with
SSA's records before the employer prepares and submits IRS W-2
forms to SSA and the employees.  Exhibit A at ¶ 3.  By contrast,
the AWR process is a totally different process that requires
employers to file W-2 forms on an annual basis.  Exhibit A at ¶

11.  Since the SSNVS is voluntary, a list of top employers in the country in terms of "no matches" could not be derived from it. Indeed, the purpose of the SSNVS is to enable employers to correct their records so that the number of "no matches" in submitted W-2 forms is reduced or eliminated.

C. <u>No Search Was Required In Order For Defendant To Respond To Plaintiff's FOIA Request.</u>  Plaintiff's FOIA request is very specific.  It seeks any list that SSA may have of the top 100 U.S. employers (or other "top" designation(s)) by name and address in terms of number of "no matches."  As explained in the memorandum in support of SSA's motion for summary judgment, any such list, even with the names and addresses of the employers redacted (which is not what plaintiff wants – it wants their names and addresses) constitutes "return" or "return information" data that is protected from public disclosure by 26 U.S.C. § 6103.

Since the lists sought by plaintiff are exempt from disclosure under Exemption 3 of the FOIA, SSA is not required to conduct a search for them (or prepare such lists from its computerized databases).  This is the teaching of <u>Church of Scientology of California v. Internal Revenue Service</u>, 792 F.2d 146, 151 (D.C. Cir. 1986), where the Court stated that the IRS's contention, that it did not have to undertake a search in response to appellant's FOIA request because of the 26 U.S.C. § 6103 prohibition, "would be justified only if, as a matter of law, all information in IRS files is return information," a state

-7-

of affairs that the Court concluded did not exist.  This state of affairs, however, does exist as to the lists of top employers in terms of "no matches" that plaintiff seeks; even redacted, such lists, which are derived solely from return information, cannot be released without violating 26 U.S.C. § 6103.  No search for such lists was, therefore, required.

At the initial scheduling hearing in this case, undersigned counsel (Fred E. Haynes) primarily responsible for this case for defendant expressed the belief that the additional time that would be provided for defendant to submit its summary judgment motion would be sufficient for it to search for top employer "no match" lists, since undersigned counsel assumed that the ability to prepare such reports would be highly centralized in the agency and thus easy to find.  Exhibit B to defendant's memorandum in support of its motion for summary judgment, the first declaration of Charles Liptz, at ¶¶ 20-22, was thought by undersigned counsel to address the issue of whether such reports had been prepared. Mr. Liptz stated that his office, the Employer Wage Reporting and Relations Staff, had prepared only one list of the top 100 employers in terms of "no matches" and that was done in 2002.  He further stated that he was not aware of any other such lists being prepared by SSA.

Subsequent to the filing of the first Liptz declaration, defendant realized that the declaration is incomplete in the sense that SSA's Office of Inspector General has independent access to the wage suspense file.  In fact, its October 2004

-8-

audit report on employers with the most suspended wage items (an audit report cited by plaintiff during the FOIA administrative process) relied on listings of the top employers that must have been prepared at a time when they were responsive to plaintiff's FOIA.  Attached as Exhibit B is a declaration from Jonanthan R. Cantor, Executive Director of the SSA's Office of Public Disclosure, which explains that the OIG is the only office, in addition to the Employer Wage Reporting and Relations Staff, that he believed would have the requested listings.  His declaration notes the two OIG reports that addressed such data.

D. <u>Requiring Defendant To Prepare The Reports Sought By Plaintiff From Its Computerized Databases Should Not, In Any Event, Be Required.</u>  If the Court were to disagree with defendant's position that the lists sought by plaintiff are exempt from disclosure, defendant submits that it should not be required to prepare and execute the computer program(s) that would be necessary to extract lists of the top 100 employers in terms of "no matches" from its databases.  As explained in the exhibits to defendant's memorandum in support of its motion for summary judgment, Exhibit B (Liptz declaration) at ¶¶ 11-17; Exhibit A (Burrows declaration) at ¶ 9, considerable effort would be involved in doing so.  In support of its position, defendant cited the fundamental principle of the FOIA that an agency is not required to create records to respond to a FOIA request.  <u>See</u> <u>Krohn v. Department of Justice</u>, 628 F.2d 195, 197-98 (D.C. Cir. 1980).  Plaintiff's response to this is to cite the Electronic

Freedom of Information Act Amendments of 1996 and to argue that these amendments impose an obligation on defendant to provide the data from its computerized databases in the form requested by plaintiff.

Prior to the 1996 amendments, several courts had recognized that there were limits as to the search that an agency could be required to do of its computerized databases. See, e.g., Church of Scientology v. IRS, 792 F.2d 146, 150-51 (D.C. Cir.1986) and Yeager v. DEA, 678 F.2d 315, 324 (D.C. Cir. 1982). The 1996 amendments only require an agency to make "reasonable efforts" to search for requested records in electronic form or format "except when such efforts would significantly interfere with the opera-tion of the agency's automated information system." 5 U.S.C. § 552(a)(3)(C). The effort imposed on defendant in making the database searches sought by plaintiff would be sufficiently burdensome that defendant should not be required to make the searches. In any event, this is an issue that the Court need not reach in deciding this case.

Conclusion

For the reasons set forth above and in defendant's memoran-dum in support of its motion for summary judgment, defendant's motion should be granted and plaintiff's cross-motion should be denied. Attached is a draft order reflecting this relief.

Respectfully submitted,

JEFFREY A. TAYLOR, DC Bar#498610
United States Attorney

-10-

RUDOLPH CONTRERAS, D.C. Bar#434122
Assistant United States Attorney
          /s/
FRED E. HAYNES, DC Bar #165654
Assistant United States Attorney
555 4th Street, N.W., Room E-4110
Washington, D.C. 20530
(202) 514-7201

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JUDICIAL WATCH, INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 06-2034 RWR |
|  | ) |
| SOCIAL SECURITY ADMINIS- | ) |
| TRATION, | ) |
|  | ) |
| Defendant. | ) |

RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL
FACT AS TO WHICH THERE IS NO DISPUTE

Plaintiff has submitted the following statement of material

fact as to which it contends that there is no genuine dispute:

SSA has failed to conduct a search for the
records sought in Judicial Watch's FOIA
request.

In response, defendant admits that at the time that it

responded to plaintiff's FOIA request, it had not conducted a

search for the records sought by plaintiff, for the reasons set

forth in defendant's memoranda filed in this case.  Subsequently,

in the declaration of Charles Liptz, Exhibit B to defendant's

memorandum in support of its motion for summary judgment, and the

declaration of Jonanthan R. Cantor, Exhibit B to defendant's

memorandum in opposition to plaintiff's cross-motion for summary

judgment, defendant has identified where such lists have been

prepared by the agency.

Respectfully submitted,

JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney
          /s/
FRED E. HAYNES, D.C. Bar#165654
Assistant United States Attorney
555 4th Street, N.W., Room E-4110
Washington, D.C. 20530
202.514.7201

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,           )
                                )
                Plaintiff,      )
                                )
v.                              ) Civil Action No. 06-2034 RWR
                                )
SOCIAL SECURITY                 )
ADMINISTRATION,                 )
                                )
                Defendant.      )
_____)

<u>ORDER</u>

UPON CONSIDERATION of defendant's motion for summary judgment and the response thereto, it is this ____ day of _____, 2007,

ORDERED that defendant's motion for summary judgment is hereby granted; and it is further

ORDERED that plaintiff's motion for summary judgment is denied; and it is further

ORDERED that this case is dismissed with prejudice from the docket of this Court.  This is a final, appealable order.


                        UNITED STATES DISTRICT JUDGE

Copies to counsel of record

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JUDICIAL WATCH, INC.,                )
     Plaintiff,                      )
                       )    Civil Number 06-2034 RWR
        v.                          )
                       )
                       )
SOCIAL SECURITY ADMINISTRATION,      )
     Defendant.                      )


## DECLARATION OF CHARLES LIPTZ

I, Charles Liptz, declare, affirm, and state:

1. I am the Director of the Employer Wage Reporting and Relations Staff (EWRRS) of the Office of Budget, Finance, and Management in the Social Security Administration (SSA or the Agency). EWRRS serves as the Agency's focal point for annual wage reporting, providing oversight and coordination to the overall wage reporting process. EWRRS is SSA's liaison with the business community and other Federal agencies concerning wage report processing.

2. I have personal knowledge of SSA's Social Security Number Verification Service (SSNVS) and SSA's Annual Wage Reporting (AWR) processes.

3. The SSNVS is an SSA business process that allows employers to voluntarily match their records of employee names and Social Security Numbers (SSN) with SSA's records before the employer prepares and submits Internal Revenue Service (IRS) Form W-2 to SSA and the employee. Because the SSNVS process is voluntary, not all employers use it. However, when an employer verifies its employees' names and SSNs


EXHIBIT
A

with SSA's SSNVS before submitting IRS Form W-2 to SSA, the company's annual wage report submission generally is completed more quickly because there are fewer mismatches.

4. SSA has set up an electronic registration process for employers to use to register and be authenticated before they may verify employees' name and SSN information. SSA describes this registration process at www.ssa.gov/employer/ssnv.htm#verify.

5. SSA's Internet web site also contains an SSNVS handbook (available at www.ssa.gov/employer/ssnvs_handbk.htm) and a pamphlet (available at www.ssa.gov/employer/ssnvspamphlet.htm) which contain more information on SSA's SSNVS process.

6. When SSA receives information from an employer using the SSNVS business process, SSA matches that information (an employee's name and SSN) with the name and SSN on SSA's Numident record. The Numident record is an electronic version of the information collected by SSA when a person applies for a new SSN or replacement SSN card.

7. When the employer's information does not match SSA's information, SSA's system generates a code to indicate the problem, i.e., why there is a mismatch.

8. SSA then reports to the employer one of several types of mismatch. If the employer uses the online version of SSNVS, SSA will inform the employer of a mismatch by securely displaying online only those names and SSNs that mismatched. If the employer sent SSA a file, then SSA will allow the employer to download a file containing only the mismatches. SSA may report any number of inconsistencies

2

including, but not limited to, that SSA never issued the SSN supplied by the employer, that the SSN does not match the individual's name, or that the name and SSN match, but the gender or date of birth of the individual does not match.

9. SSA recommends that if a mismatch cannot be resolved by the employer, the employer should recommend to the employee that he or she take steps to correct the problem, including contacting his or her local Social Security office.

10. The AWR process (called Combined Annual Wage Reporting, CAWR, by the IRS) is a totally different business process that requires employers to file an IRS Form W-2 with SSA on a yearly basis. This process requires the efforts and agreement of both SSA and the IRS.

11. Each year, employers must send Copy A of IRS Form W-2 (Wage and Tax Statement) to SSA by the last day of February (or last day of March if filed electronically) to report the wages and taxes of its employees for the previous calendar year. In addition, each employer must give an IRS Form W-2 to each employee by January 31 for individual income tax purposes. Employers send IRS W-2 forms to SSA along with IRS W-3 forms (Transmittal of Income and Tax Statements) in paper form or via the Magnetic Media Reporting and Electronic Filing (MMREF) format for electronic filing of W-2s. Further information about these forms is available at IRS Instructions for Forms W-2 W-3

12. The CAWR process is required by section 232 of the Social Security Act, 42 U.S.C. § 432. To effectuate the CAWR process the two Agencies must enter into an Agreement.

13. Article VIII of the August 4, 1998, Agreement Between the Social Security Administration and the Internal Revenue Service provides disclosure standards and states that disclosure of CAWR information is subject to Internal Revenue Code section 6103(p)(4), 26 U.S.C. § 6103(p)(4).

14. The IRS Form W-2 must comply with the specifications required by the IRS in Revenue Procedure 2006-55, Publication 1141. (IRS' Publication 1141, General Rules and Specifications for Substitute Forms W-2 and W-3).

15. The IRS Form W-2 includes data such as: the employee's name, SSN, amount of earnings, tax deductions, and the employer's Employer Identification Number (EIN). SSA collects the IRS Form W-2 information, posts the wage data for each employee, based on their SSN, to the Master Earnings File (MEF) and forwards the information to the IRS pursuant to the Agreement between the two Agencies. IRS considers all of this information to be IRS data that is only processed by SSA.

16. When SSA processes the data from IRS Form W-2, discrepancies in data become apparent. One of the discrepancies involves wages. The SSA/IRS Earnings Reconciliation Process compares employer wage data submitted to IRS in IRS Form 941 against employees' wage data submitted to SSA via the IRS Forms W-2 and W-3. When more wages are reported to IRS than to SSA, SSA is concerned that it does not properly credit employees' earnings to the Agency's records. SSA examines some of these cases and makes an effort to resolve the difference without contacting the employer.

17. When an effort to resolve the discrepancy is unsuccessful or a resolution is not possible without employer assistance, SSA sends a notice and questionnaire to the employer, requesting the earnings data needed to resolve the discrepancy. The process of

resolving discrepancies in wage data is a joint SSA-IRS initiative. Samples of two types of first attempt reconciliation letters are available on SSA's web page. They may be accessed using the following links   (www.ssa.gov/employer/recon/norec.htm) or (www.ssa.gov/employer/recon/discre.htm).

18. If SSA does not receive a response after 120 days, SSA sends the employer a second notice. Samples of these notices are also available on the SSA web site and the public can access them from the following links (www.ssa.gov/employer/recon/norec2.htm) or (www.ssa.gov/employer/recon/second.htm).

19. If SSA receives no response to the second letter, IRS is responsible for contacting the employer. Under the SSA/IRS Employer Earnings Reconciliation Process, the IRS may assess a penalty at this point, if necessary.

20. Another discrepancy that arises when SSA processes data for the IRS occurs when an employee's name and SSN as shown on IRS Form W-2 does not match the name and SSN on SSA records. When this occurs, SSA puts the information into a holding file called the Earnings Suspense File (ESF). However, because the information is on an IRS form, SSA reports wage and other information from these records to IRS, even though it does not match SSA's records. These mismatches are reported via the CAWR process along with the IRS Form W-2s that match SSA's records. There is not a separate process to notify the IRS of name and SSN mismatches.

21. When the employee's name and SSN, as shown on IRS Form W-2, does not match the name and SSN in SSA records, SSA sends a letter to the employee or self-employed individual to inform him or her of the name and SSN no-match. The address

of the employee is derived from the IRS form W-2 and other data provided by the IRS. If the address is unavailable or does not exist in the United States Postal database, SSA sends a letter to the employer. When data from an IRS Form W-2 does not match SSA's name and SSN records, the letter sent to the employee/employer is referred to as a Decentralized Correspondence (Decor) Notice.

22. In addition, if an employer submits more than ten IRS Form W-2s in a wage report that do not match SSA's name and SSN records, and the no-matches exceed 0.5 percent of the total number of IRS Form W-2s sent by the employer, SSA notifies the employer of the name/SSN no matches and sends an Educational Correspondence (EDCOR) (Code V- No-match letter). The purpose of the EDCOR letter is to inform the employer of these mismatches and to recommend that they correct the discrepancy so the employees' wages may be posted to the correct account.

23. IRS retains final responsibility for reconciling discrepancies with the employer's EIN number.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on June $\underline{15}$ 2007.

By: _Charles Liptz_

Charles Liptz
Director, Employer Wage Reporting and
  Relations Staff
Office of Budget, Finance, and Management
Social Security Administration

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC          )
                                 )
           Plaintiff,       )
                                 )     Case No. 06-2034 RWR
     v.                    )
                                 )
SOCIAL SECURITY ADMINISTRATION )
                                 )
                                 )

## DECLARATION OF JONATHAN R. CANTOR

I, Jonathan R. Cantor, hereby declare as follows:

1) I am the Executive Director in the Office of Public Disclosure (OPD) of the Social Security Administration (SSA). OPD is responsible for establishing policies and practices to administer the Freedom of Information Act (FOIA), 5 U.S.C. § 552; the Privacy Act, 5 U.S.C. § 552a; the Internal Revenue Code (IRC) provision on disclosure, 26 U.S.C. § 6103, as it pertains to SSA; section 1106 of the Social Security Act, 42 U.S.C. § 1306; SSA regulations on disclosure, 20 C.F.R. Parts 401 and 402; and other disclosure issues. In addition, OPD is responsible for deciding whether to release or withhold records under the FOIA.

2) I have personal knowledge of procedures used in handling FOIA requests for information from SSA files pursuant to Title 5 United States Code, section 552.

3) By letter dated June 6, 2006, Christopher Farrell on behalf of Judicial Watch, Inc. submitted an FOIA request to SSA. The request asked for "[a]ll records detailing the top 100 U.S. employers receiving the highest number of Social Security number mismatches, as described by the Social Security Administration's Code V

1



EXHIBIT
B

letter program ("EDCOR")" we seek a listing of the top 100 U.S. employers by number of "no match" instances/notification." *See* Exh. 1.

4) In this case, I personally reviewed the request. Upon review of the request, I concluded after discussion with my staff that the documents are considered tax return information which the IRC prohibits SSA from disclosing, thus I advised my staff to assert exemption (b) (3). Further, I determined no search was necessary as we were prohibited by § 6103 of the IRC from releasing any information. The FOIA, at 5 U.S.C. § 552(b)(3) does not require disclosure when another law prohibits it.

5) Based on this conclusion, my staff issued a letter dated June 29, 2006, signed by Willie Polk, Freedom of Information Officer, responding to Plaintiff on behalf of SSA stating that SSA can not release the requested information because § 6103 of the IRC prohibits the disclosure of tax return information for other than Social Security purposes. *See* Exh. 2.

6) By letter dated August 2, 2006, Plaintiff appealed SSA's denial of the disclosure of information asserting the information was not tax return information but rather statistical data. *See* Exh. 3.

7) By letter dated October 16, 2006, I issued a final decision on behalf of SSA denying the disclosure of the requested information based on exemption (b)(3) of FOIA and § 6103 of the IRC. *See* Exh. 4.

8) While preparing a response to the complaint filed by Judicial Watch, Inc., I learned that one document was prepared by SSA in 2002, in response to an investigation by the Treasury Inspector General for Tax Administration.

2

9) The document was created by Charles Liptz, Director of the Employer Wage Reporting and Relations Staff (EWRRS) of SSA. The document is a chart that lists the 100 employers with the most EDCOR mismatches for the years 1999-2000. It contains the employer's EIN, name of the employer, address of the employer, the total number of "bad" SSNs and the percentage of "bad" SSNs broken down by tax year examined.

10) The chart was compiled from information submitted by employers on IRS Form W2s as part of the annual wage reporting process. Because the information comes directly from IRS Form W2, it is considered tax return information protected by §6103 of the IRC. As such, SSA has no authority to release the information and would withhold the information under 5 U.S.C. § 552(b)(3).

11) Although 5 U.S.C. § 552(b)(3) does not require a search, I contacted SSA's Office of Inspector General (OIG) on or around May 15, 2007 to determine if additional records existed at SSA that might be responsive.

12) I contacted the OIG because I believed they were the only other component at SSA to have any reports related to EDCOR mismatches.

13) The OIG searched both paper and electronic records and found no records that were responsive to the request other than the tax data used by the OIG to produce two audit reports that may be accessed at:
http://www.ssa.gov/oig/ADOBEPDF/audittxt/A-03-03-13048.htm and
http://www.ssa.gov/oig/ADOBEPDF/A-08-05-25023.pdf. These reports and the working papers containing tax information used to create the reports are the only known records that are responsive to the incoming request.

3

14) To my knowledge the only other office that would have relevant information is the Employer Wage Reporting and Relations Staff (EWRRS) of SSA. I had already confirmed that this office had no documents responsive to the request other than what is mentioned above.

15) I declare under the penalty of perjury that the foregoing is true and correct.

Executed on June ⟨20⟩ 2007.

Jonathan R. Cantor
Executive Director, Office
 of Public Disclosure
Social Security Administration

4

```
                    ***********************
                *** TX REPORT ***
                    ***********************

    TRANSMISSION OK

    TX/RX NO              3539
    CONNECTION TEL          9*818*1p410p966p4304
    CONNECTION ID
    ST. TIME              06/06 18:14
    USAGE T              01'57
    PGS. SENT              7
    RESULT              OK
```

*F16579*
*for hot*

# Fax

## Judicial Watch

To: Social Security Administration    From: Judicial Watch

Fax: 410 966 4304    Date: 6/6/06

Phone:    Pages: 7

Re: Freedom of Information Act request

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply

**Comments:** If you do not receive all pages, please call 202-646-5172

JUN   9 2006



# Judicial Watch
*Because no one is above the law!*

## VIA FACSIMILE AND CERTIFIED U.S. MAIL

June 6, 2006

SOCIAL SECURITY ADMINISTRATION
Office of Public Disclosure
3-A-6 Operations Building
6401 Security Boulevard
Baltimore, Maryland, 21235
(Fax. No.: 410-966-6645)

*F02079*
*forhot*

### Re:  Freedom of Information Act Request

Dear Sir/Madam:

Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the Social Security Administration produce the following agency within twenty (20) business days:

- All records detailing the top 100 U.S. employers receiving the highest number of Social Security number mismatches, as described by the Social Security Administration's Code V letter program ("EDCOR"). Specifically, we seek a listing of the top 100 U.S. employers by number of "no match" instances/notifications. Should U.S. employers be identified by some other enumeration (i.e. top 10, top 50, etc.) we seek those records as well.

**The time frame for this request is from January 1, 2001 to present.**

For purpose of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses,

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 2

statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or
newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored
material of any kind, including without limitation all electronic mail or e-mail, meaning any
electronically transmitted text or graphic communication created upon and transmitted or
received by any computer or other electronic device, and all materials stored on compact disk,
computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records,
recordings, or representations of any kind, including without limitation all cassette tapes,
compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs,
or videotapes; (4) any graphic materials and data compilations from which information can be
obtained; (5) any materials using other means of preserving thought or expression; and (6) any
tangible things from which data or information can be obtained, processed, recorded, or
transcribed. The term "record" also shall mean any drafts, alterations, amendments, changes, or
modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you
require clarification of this request or any portion thereof, please contact us immediately at
202-646-5172.**

Judicial Watch is willing to accept "rolling production" of responsive records as they are
identified. Judicial Watch will accept paper or electronic copies of all responsive records.

If any responsive record or portion thereof is claimed to be exempt from production under
FOIA, please provide sufficient identifying information with respect to each allegedly exempt
record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v.
Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). In addition, any
reasonably segregable portion of a responsive record must be provided, after redaction of any
allegedly exempt material. 5 U.S.C. § 552(b).

**Judicial Watch also hereby requests a waiver of both search and duplication fees
pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).**

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II)
because it is a member of the news media. Judicial Watch, Inc. regularly obtains information
about the operations and activities of government through FOIA and other means, uses its
editorial skills to turn this information into distinct works, and publishes and disseminates these
works to the public. It intends to do likewise with the records it receives in response to this
request.

As a member of the news media, Judicial Watch uses the following means, among others,
to publish and disseminate its distinctive work to the public:

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 3

(1)    Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the public can review records obtained through FOIA and read editorial works prepared by Judicial Watch, Inc., including news releases, based on FOIA materials. This website is viewed by over 20,000 people per day on average, and on several occasions, has logged up to 1,000,000 visitors in a single day.

(2)    Judicial Watch also publishes a monthly newsletter in which it publishes its own editorial works and presents, analyzes, and explains information it obtains through FOIA. Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each month. The organization also utilizes an e-mail Infonet service that sends out updates of Judicial Watch's activities over the Internet to almost 14,00 persons.

(3)    Judicial Watch also periodically publishes and disseminates its own distinct works in the form of books and reports. For example:

• September 1998 – Judicial Watch, Inc. published the *Interim Report on Crimes and Other Offenses Committed by President Bill Clinton Warranting His Impeachment and Removal from Elected Office*. This 145-page report was accompanied by nearly 4,000 pages of supporting documentation and was crafted, in part, from the raw materials obtained by Judicial Watch through FOIA requests, among among other regular means.

• August 1999 – Judicial Watch published *Filegate Status Report*, which is 136 pages long and is supported by nearly 1000 pages of documentation.

• March 2001 – Judicial Watch published *The Judicial Watch Florida Recount*, an independent, non-partisan analysis of the results of Florida's hotly contested 2000 Presidential election based upon a sampling of ballots reviewed by Judicial Watch pursuant to Florida's version of FOIA.

• February 2002 – Judicial Watch published *The Judicial Watch 2002 "State of the Union" Report, Bush Administration Ethics Enforcement: "A Failure of Leadership."*

• September 2002 – Judicial Watch published *Fatal Neglect: The U.S. Government's Continuing Failure to Protect American Citizens from Terrorists.*

• November 21, 2003 – Judicial Watch produced *Analysis of GAO Testimony: US Postal Service – Clear Communication With Employees Needed Before Reopening of Brentwood Facility*. (GAO-04-2057T/October23, 2003). Comptroller General of the United States David M. Walker, in a reply To Judicial Watch's Analysis of GAO Testimony, wrote on December 17, 2003, "We view Judicial Watch as an important accountability organization in Washington, D.C."

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 4

- June 29, 2005 – Judicial Watch produced a special Report *US Border Patrol Survey Analysis*, an analysis of documents produced under FOIA.
  [ http://www.judicialwatch.org/borderpatrolreport.shtml ]

- February 3, 2006 – Judicial Watch held an educational panel at the National Press Club and published a Special Report of the event *A Discussion of Ethics in Washington*
  [http://www.judicialwatch.org/archive/2006/special-report-ethics.pdf ]

- May 9, 2006 – Judicial Watch produced *The Clinton RU-486 Files*, a special report of the Clinton administration's effort to put the abortion drug RU-486 on the market in the United States, based on documents obtained from the National Archives at the Clinton Presidential Library and in the course of a five year FOIA litigation battle between Judicial Watch and the U.S. Food and Drug Administration (FDA).

Judicial Watch also publishes and disseminates its distinctive work by participating in public conferences and seminars, including its own "Ethics in Government" conferences held in Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001). Judicial Watch hold quarterly education panels at the National Press Club in Washington DC that have been televised by C-SPAN. Past panel discussions have been: "A Discussion of Ethics in Washington," "The Case for Open Government," "Conservative Perspectives on the Alito Nomination," and "The Role of Grassroots Groups in the Supreme Court Nominating Process." Judicial Watch also works with other media organizations to publish and disseminate distinctive work to the public, and representatives of Judicial Watch appear frequently on nationally broadcast television and radio programs. Judicial Watch has been granted press credentials at a number of national conventions and other events. On February 16, 2005, Judicial Watch was rated by the highly respected capitol newspaper *The Hill* as being on of the nation's top ten "watchdogs."

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the news media. *See National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. *See Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 5

likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts document the operations and activities of the federal government and to educate the public about these operations and activities. As part of its Transparency Project, Judicial Watch is investigating the submission of employee/employer information to the Social Security Administration regarding employees' Social Security numbers and the resultant Code V letters.

Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. *See D.C. Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. § 16.11(k)(2)(I)-(iv). Request for "public interest" waivers are to be judged on a case-by-case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

Without question, the subject-matter of the request concerns the operations and activities of government, namely details of employee/employer information submissions to the Social Security Administration, as well as workers whose funds are being placed into the Earnings Suspense File.

Disclosure of the requested records is likely to contribute to an understanding of government operations and activities and will appeal to a "reasonably broad" audience. Social Security solvency and the instances of "no match" information submissions bear directly on the current and future operations of the Social Security Administration.

Indeed, the American public deserves full disclosure of the details of U.S. employers with high incidents of "no match" filings. One study indicated that Wal-Mart may have had thousands

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 6

of Code V letters sent to them[1], and the public deserves to know how many other companies are similarly situated by practice.

Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its analysis, as well as the records themselves, as a special written report. Judicial Watch will also educate the public via radio programs, Judicial Watch's website, and/or newsletter, among other outlets. It also will make the records available to other members of the media or researchers upon request. Judicial Watch has a proven ability to disseminate information obtained through FOIA to the public, as demonstrated by its long-standing and continuing public outreach efforts, including radio and television programs, website, newsletter, periodic published reports, public appearances, and other educational undertakings.

Finally, disclosure of the requested records will contribute significantly to the public's understanding because relatively little is known about the nature of the Social Security Administration's Code V letter program, nor its implication on the Earnings Suspense File. The records requested by Judicial Watch undoubtedly will shed additional light on this important matter.

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

We look forward to receiving the requested documents and a waiver of both search and duplication costs within twenty (20) business days.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell

---

[1]Mehata et al. 2003. "Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights". University of Illinois Chicago (Center for Urban Economic Development). Pg. 9

# SOCIAL SECURITY

Refer to:
S9H: PN0463                              June 29, 2006

Judicial Watch, Inc.
Mr. Christopher J. Farrell
501 School Street, SW
Suite 500
Washington, DC 20024

Dear Mr. Farrell:

This is in response to your Freedom of Information Act (FOIA) request, dated June 6, 2006, for all records detailing the top 100 U.S. employers receiving the highest number of Social Security number mismatches, as described by the Social Security Administration's Code V letter program ("EDCOR"). You specifically seek a listing of the top 100 U.S. employers by number of "no match" instances/notifications from January 1, 2001 to the present.

We cannot comply with your request for the above information. "No-match" instances/notifications are considered tax return information which the Internal Revenue Code (IRC) prohibits SSA from disclosing. We receive employment information from tax returns filed with the Internal Revenue Service (IRS). "No-match" instances/notifications are generated by SSA based on employment information SSA receives from the IRS. Under the IRC, this information is considered to be tax return information (26 U.S.C. § 6103). The IRC generally prohibits us from disclosing this information for other than Social Security purposes. The FOIA does not require disclosure when another law prohibits it (5 U.S.C. § 552(b)(3)).

There is no fee for processing this request.

If you disagree with this decision, you may request a review. Mail your appeal within 30 days after you receive this letter to the Executive Director for the Office of Public Disclosure, Social Security Administration, 6401 Security Boulevard, Baltimore, Maryland 21235. Mark the envelope "Freedom of Information Appeal."

                              Sincerely,

                              Willie J. Polk

Freedom of Information Officer

.



# Judicial Watch

*Because no one is above the law!*

August 2, 2006

**BY FEDEX & FAX (410-966-0869)**

Mr. Jonathan Cantor
Executive Director
Office of Public Disclosure
Social Security Administration
6401 Security Boulevard, Room 617
Baltimore, MD  21235

### Re:  Freedom of Information Appeal

Dear Mr. Cantor:

Introduction

      Judicial Watch, Inc. (hereafter "Judicial Watch") is a non-profit, non-partisan educational foundation that promotes transparency, integrity and accountability in government, politics and the law.  Through its educational endeavors, Judicial Watch advocates high standards of ethics and morality in our nation's public life and seeks to ensure that political and judicial officials do not abuse the powers entrusted to them by the American people.   Judicial Watch fulfills its educational mission through litigation, investigations and public outreach as a member of the media.

Background

      According to the Congressional testimony of Social Security Administration (SSA) Deputy Commissioner Martin H. Gerry, the SSA sent approximately 120,000 employer "no match" letters in 2004 covering 7.3 million mismatched records.[1]

      On June 6, 2006 Judicial Watch filed a Freedom of Information Act (FOIA) request with the SSA seeking a listing of the top 100 U.S. employers by "no match"

---

[1] Statement of Martin H. Gerry, Deputy Commissioner, Office of Disability and Income Security Programs, Social Security Administration, Before the Senate Judiciary Committee, Subcommittee on Immigration, Border Security and Citizenship, June 19, 2006, found at: http://www.ssa.gov/legislation/testimony_061906.html

AUG  4 2006

Mr. Jonathan Cantor
Executive Director, Office of Public Disclosure
Social Security Administration
Re:  Freedom of Information Appeal
August 2, 2006
Page 2

instances/notifications (as described by the SSA's Code V letter program – "EDCOR")
from January 1, 2001 to the present. (See Exhibit 1)  Should the SSA maintain some
other enumeration (i.e., top 50 or top 10), we sought those records as well.

In a letter dated June 29, 2006 (and postmarked July 3, 2006), which Judicial
Watch received on July 6, 2006, SSA Freedom of Information Officer Willie J. Polk
wrote: "We cannot comply with your request for the above information.  'Non-match'
instances/notifications are considered tax return information which the Internal Revenue
Code (IRC) prohibits SSA from disclosing."  In his FOIA denial, Mr. Polk identified
your office as the administrative review authority for FOIA appeals and set a 30-day limit
for action on our part. (See Exhibit 2)

This letter serves as Judicial Watch's administrative appeal of Mr. Polk's denial
of our FOIA request.  We seek review and reconsideration of our FOIA request and the
production of requested records under the provision of 5 U.S.C. §552.

Discussion

Judicial Watch does not seek "tax return information" which the Internal Revenue
Code (IRC) prohibits the SSA from disclosing.  The information sought by Judicial
Watch is strictly administrative in nature and consistent with the statistical and research
data defined and discussed in 20 C.F.R. §401.165.  No financial or tax data is being
sought, nor do we seek any information used to make any return determination.  We are
simply interested in a statistical listing of the number of instances a recorded
administrative act occurred.  Specifically, that statistical listing is the top U.S. employers
receiving the most "no match" letters.  According to the SSA Policy Internet site, the
letters are merely intended as helpful "customer service" reminders.

The SSA Policy Internet site best characterizes and defines the general, statistical
nature of the records addressed in our FOIA request.  Official SSA policy does not even
require or obligate a response from an employer to an EDCOR (Code V – no-match
letter).[2]  A statistical summary of the top employers receiving these reminders in no way
divulges "tax return information."  The fact that the SSA does not even require a response
to the "no match" letter from the employer clearly demonstrates the strictly ministerial,
non-sensitive, statistical nature of this administrative act.[3]  The "no match" letters are an

---

[2] See:
https://s044a90.ssa.gov/apps10/poms.nsf/517e83681a5eb8b28525688d0058721c/cb5bd717862bf82885256
f26000c7319!OpenDocument

[3] Neither the SSA nor the Internal Revenue Service generally penalizes employers who submit inaccurate
wage reports. See:  SSA Office of the Inspector General Audit Report: "Social Security Number Misuse in

Mr. Jonathan Cantor
**Executive Director, Office of Public Disclosure**
**Social Security Administration**
Re:  Freedom of Information Appeal
August 2, 2006
Page 3

educational program of the SSA. Judicial Watch, as an educational foundation, seeks information concerning your program activities.

The sample text of the "no match" letter itself makes very clear that no negative inference should be drawn from the mere fact that the letter has been issued by the SSA. The SSA Policy Internet page sample letter states:

> **IMPORTANT:**  This letter does not imply that you or your employee intentionally gave the government wrong information about the employee's name or Social Security number. Nor does it make any statement about an employee's immigration status. [Emphasis in original.]

Judicial Watch is not seeking to obtain "no match" letters, nor do we seek any information contained in "no match" letters (i.e., W-2 data).

Judicial Watch seeks information far less sensitive than data readily available on the SSA Internet website, namely, the SSA Office of the Inspector General (OIG) Audit Report: "Unauthorized Work Social Security Numbers at the Department of Defense," Report No. A-03-05-25127, September 2005.[4] The report identifies the employer (Defense Department), specific components (e.g., Army, Navy, etc.), number of unauthorized employees, countries of origin, specific wage data, characteristics of unauthorized employees, length of employment, agency findings and recommendations. Arguably, the subject matter and degree of specificity in this report constitutes disclosure of "tax return information" by the SSA OIG, under Mr. Polk's interpretation of the term, and as applied in the denial of our FOIA request.

Another SSA OIG Audit Report provides information closely related to our FOIA request, but falls short with respect to the specificity we seek concerning employers. "Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001," Report No. A-03-03-13048, October 2004, addresses industry-wide patterns for the service, restaurant, hotel and agriculture sectors of our economy in general terms.[5]

---

the Service, Restaurant and Agriculture Industries," Report No. A-08-05-25023, April 2005, page 9, found at: http://www.ssa.gov/oig/ADOBEPDF/A-08-05-25023.pdf

[4] See:  http://www.ssa.gov/oig/ADOBEPDF/A-03-05-25127.pdf

[5] See:  http://www.ssa.gov/oig/ADOBEPDF/A-03-03-13048.pdf

Mr. Jonathan Cantor
Executive Director, Office of Public Disclosure
Social Security Administration
Re:  Freedom of Information Appeal
August 2, 2006
Page 4

In our view, the OIG Defense Department report (No. A-03-05-25127) represents a "high end" bracket of detailed information that arguably contains "taxpayer information." The OIG 5-year study (No. A-03-03-13048) is too broad and does not apply to the time period we are interested in studying. It forms the "low end" of the bracket of releasable material. The disclosures in the two SSA reports demonstrate that summarized information related to "no match statistics" can be disclosed and should be made available through FOIA. The information sought in our request falls between the extremely detailed reporting in the Defense Department report and the general, industry-wide survey of the OIG 5 year report. The specific listing we seek is consistent with statistical data reports

Once again: No financial or tax return data is being sought, nor do we seek any information used to make any agency determination. Judicial Watch is not seeking to obtain "no match" letters, nor do we seek any information contained in "no match" letters (i.e. W-2 data).

Statistical records of "no match" letter instances would provide the taxpaying public with a statistical benchmark or yardstick to objectively evaluate the SSA's "educational correspondence" policies and programs. Judicial Watch seeks to evaluate SSA performance over a period of years based upon release of the requested information. The SSA's Internet site provides policy guidance to the agency, employers and the taxpaying public concerning EDCOR Code V letter policy implementation.

Our research indicates that it costs the SSA $300 to correct an item once it is in a "suspense" account, versus the 50 cents it costs the agency to post correct information to a valid earnings record. The information sought by Judicial Watch's FOIA request would educate the American public about the operations of the SSA with respect to this specific government program and its effectiveness.

Therefore, upon review and reconsideration of our June 6, 2006 FOIA request, Judicial Watch requests that you reverse the decision of Mr. Polk and produce the requested records.

Administration

Judicial Watch understands that in accordance with 20 CFR §402.200, a decision on this appeal must be made within 20 working days after your receipt of this letter. The SSA Commissioner or a designee may extend this time limit up to 10 additional working days if one of the situations in §402.140(a) exists, provided that, if a prior extension was used to process this request, the sum of the extensions may not exceed 10 working days.

**Mr. Jonathan Cantor**
**Executive Director, Office of Public Disclosure**
**Social Security Administration**
**Re:  Freedom of Information Appeal**
**August 2, 2006**
**Page 5**

Please notify Judicial Watch in writing of any extension, the reason for the extension, and the date by which our appeal will be decided.

Please contact the undersigned should you have any questions or require additional information concerning this appeal.

Conclusion

Kindly reconsider Mr. Polk's denial and grant this FOIA appeal, directing the relevant SSA office to produce records responsive to our June 6, 2006 request.

Thank you for your consideration and cooperation.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell
Director of Investigations & Research

# Exhibit 1



# Judicial Watch

*Because no one is above the law!*



### VIA FACSIMILE AND CERTIFIED U.S. MAIL

June 6, 2006

SOCIAL SECURITY ADMINISTRATION
Office of Public Disclosure
3-A-6 Operations Building
6401 Security Boulevard
Baltimore, Maryland, 21235
(Fax. No.: 410-966-6645)

### Re: Freedom of Information Act Request

Dear Sir/Madam:

Pursuant to the provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc. hereby requests that the Social Security Administration produce the following agency within twenty (20) business days:

- All records detailing the top 100 U.S. employers receiving the highest number of Social Security number mismatches, as described by the Social Security Administration's Code V letter program ("EDCOR"). Specifically, we seek a listing of the top 100 U.S. employers by number of "no match" instances/notifications. Should U.S. employers be identified by some other enumeration (i.e. top 10, top 50, etc.) we seek those records as well.

**The time frame for this request is from January 1, 2001 to present.**

For purpose of this request, the term "record" shall mean: (1) any written, printed, or typed material of any kind, including without limitation all correspondence, memoranda, notes, messages, letters, cards, telegrams, teletypes, facsimiles, papers, forms, records, telephone messages, diaries, schedules, calendars, chronological data, minutes, books, reports, charts, lists, ledgers, invoices, worksheets, receipts, returns, computer printouts, printed matter, prospectuses,

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 2

statements, checks, statistics, surveys, affidavits, contracts, agreements, transcripts, magazine or newspaper articles, or press releases; (2) any electronically, magnetically, or mechanically stored material of any kind, including without limitation all electronic mail or e-mail, meaning any electronically transmitted text or graphic communication created upon and transmitted or received by any computer or other electronic device, and all materials stored on compact disk, computer disk, diskette, hard drive, server, or tape; (3) any audio, aural, visual, or video records, recordings, or representations of any kind, including without limitation all cassette tapes, compact disks, digital video disks, microfiche, microfilm, motion pictures, pictures, photographs, or videotapes; (4) any graphic materials and data compilations from which information can be obtained; (5) any materials using other means of preserving thought or expression; and (6) any tangible things from which data or information can be obtained, processed, recorded, or transcribed.  The term "record" also shall mean any drafts, alterations, amendments, changes, or modifications of or to any of the foregoing.

**If you do not understand this request or any portion thereof, or if you feel you require clarification of this request or any portion thereof, please contact us immediately at 202-646-5172.**

Judicial Watch is willing to accept "rolling production" of responsive records as they are identified.  Judicial Watch will accept paper or electronic copies of all responsive records.

If any responsive record or portion thereof is claimed to be exempt from production under FOIA, please provide sufficient identifying information with respect to each allegedly exempt record or portion thereof to allow us to assess the propriety of the claimed exemption. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974).  In addition, any reasonably segregable portion of a responsive record must be provided, after redaction of any allegedly exempt material.  5 U.S.C. § 552(b).

**Judicial Watch also hereby requests a waiver of both search and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 5 U.S.C. § 552(a)(4)(A)(iii).**

Judicial Watch is entitled to a waiver of search fees under 5 U.S.C. § 552(a)(4)(A)(ii)(II) because it is a member of the news media.  Judicial Watch, Inc. regularly obtains information about the operations and activities of government through FOIA and other means, uses its editorial skills to turn this information into distinct works, and publishes and disseminates these works to the public.  It intends to do likewise with the records it receives in response to this request.

As a member of the news media, Judicial Watch uses the following means, among others, to publish and disseminate its distinctive work to the public:

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 3

(1)    Judicial Watch maintains an Internet site, www.JudicialWatch.org, where the
public can review records obtained through FOIA and read editorial works prepared by
Judicial Watch, Inc., including news releases, based on FOIA materials. This website is
viewed by over 20,000 people per day on average, and on several occasions, has logged
up to 1,000,000 visitors in a single day.

(2)    Judicial Watch also publishes a monthly newsletter in which it publishes its own
editorial works and presents, analyzes, and explains information it obtains through FOIA.
Judicial Watch, Inc.'s newsletter is sent to approximately 140,000 individuals each
month. The organization also utilizes an e-mail Infonet service that sends out updates of
Judicial Watch's activities over the Internet to almost 14,00 persons.

(3)    Judicial Watch also periodically publishes and disseminates its own distinct
works in the form of books and reports. For example:

• September 1998 – Judicial Watch, Inc. published the *Interim Report on Crimes and
    Other Offenses Committed by President Bill Clinton Warranting His Impeachment
    and Removal from Elected Office*. This 145-page report was accompanied by
    nearly 4,000 pages of supporting documentation and was crafted, in part, from
    the raw materials obtained by Judicial Watch through FOIA requests, among
    among other regular means.

• August 1999 – Judicial Watch published *Filegate Status Report*, which is
    136 pages long and is supported by nearly 1000 pages of documentation.

• March 2001 – Judicial Watch published *The Judicial Watch Florida Recount*,
    an independent, non-partisan analysis of the results of Florida's hotly
    contested 2000 Presidential election based upon a sampling of ballots
    reviewed by Judicial Watch pursuant to Florida's version of FOIA.

• February 2002 – Judicial Watch published *The Judicial Watch 2002
    "State of the Union" Report, Bush Administration Ethics Enforcement:
    "A Failure of Leadership."*

• September 2002 – Judicial Watch published *Fatal Neglect: The U.S.
    Government's Continuing Failure to Protect American Citizens
    from Terrorists.*

• November 21, 2003 – Judicial Watch produced *Analysis of GAO Testimony:
    US Postal Service – Clear Communication With Employees Needed
    Before Reopening of Brentwood Facility.* (GAO-04-2057T/October23, 2003).
    Comptroller General of the United States David M. Walker, in a reply
    To Judicial Watch's Analysis of GAO Testimony, wrote on December
    17, 2003, "We view Judicial Watch as an important accountability
    organization in Washington, D.C."

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 4

- June 29, 2005 – Judicial Watch produced a special Report *US Border Patrol Survey Analysis*, an analysis of documents produced under FOIA. [ http://www.judicialwatch.org/borderpatrolreport.shtml ]

- February 3, 2006 – Judicial Watch held an educational panel at the National Press Club and published a Special Report of the event *A Discussion of Ethics in Washington* [http://www.judicialwatch.org/archive/2006/special-report-ethics.pdf ]

- May 9, 2006 – Judicial Watch produced *The Clinton RU-486 Files*, a special report of the Clinton administration's effort to put the abortion drug RU-486 on the market in the United States, based on documents obtained from the National Archives at the Clinton Presidential Library and in the course of a five year FOIA litigation battle between Judicial Watch and the U.S. Food and Drug Administration (FDA).

Judicial Watch also publishes and disseminates its distinctive work by participating in public conferences and seminars, including its own "Ethics in Government" conferences held in Pasadena, California (1999), Washington, DC (2000), and Miami, FL (2001). Judicial Watch hold quarterly education panels at the National Press Club in Washington DC that have been televised by C-SPAN. Past panel discussions have been: "A Discussion of Ethics in Washington," "The Case for Open Government," "Conservative Perspectives on the Alito Nomination," and "The Role of Grassroots Groups in the Supreme Court Nominating Process." Judicial Watch also works with other media organizations to publish and disseminate distinctive work to the public, and representatives of Judicial Watch appear frequently on nationally broadcast television and radio programs. Judicial Watch has been granted press credentials at a number of national conventions and other events. On February 16, 2005, Judicial Watch was rated by the highly respected capitol newspaper *The Hill* as being on of the nation's top ten "watchdogs."

Consequently, Judicial Watch qualifies for a waiver of search fees as a member of the news media. *See National Security Archive v. U.S. Department of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). In fact, Judicial Watch has been recognized as a member of the news media in other FOIA litigation. *See Judicial Watch, Inc. v. U.S. Department of Justice*, 133 F. Supp.2d 52 (D.D.C. 2000).

Judicial Watch also is entitled to a complete waiver of both search fees and duplication fees pursuant to 5 U.S.C. § 552(a)(4)(A)(iii). Under this provision, records:

shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 5

    likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii).

    Judicial Watch is a 501(c)(3), not-for-profit, educational organization, and, by definition, it has no commercial purpose. Judicial Watch exists to educate the public about the operations and activities of government, as well as to increase public understanding about the importance of ethics and the rule of law in government. The particular records requested herein are sought as part of Judicial Watch ongoing efforts document the operations and activities of the federal government and to educate the public about these operations and activities. As part of its Transparency Project, Judicial Watch is investigating the submission of employee/employer information to the Social Security Administration regarding employees' Social Security numbers and the resultant Code V letters.

    Courts applying the "public interest" fee waiver provision of FOIA typically take into account four factors in determining whether to grant a waiver: (1) whether the subject of the requested records concerns the operations or activities of government; (2) whether disclosure of the requested records is likely to contribute to an understanding of government operations or activities; (3) whether disclosure of the requested records will contribute to a "reasonably broad" audience and whether the requestor has the "ability and intention" to disseminate the information to the public; and (4) whether disclosure of the requested record will contribute "significantly" to the public understanding. *See D.C. Technical Assistance Org. v. HUD*, 85 F. Supp.2d 46, 48-49 (D.D.C. 2000); 28 C.F.R. § 16.11(k)(2)(I)-(iv). Request for "public interest" waivers are to be judged on a case-by-case basis." *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

    Without question, the subject-matter of the request concerns the operations and activities of government, namely details of employee/employer information submissions to the Social Security Administration, as well as workers whose funds are being placed into the Earnings Suspense File.

    Disclosure of the requested records is likely to contribute to an understanding of government operations and activities and will appeal to a "reasonably broad" audience. Social Security solvency and the instances of "no match" information submissions bear directly on the current and future operations of the Social Security Administration.

    Indeed, the American public deserves full disclosure of the details of U.S. employers with high incidents of "no match" filings. One study indicated that Wal-Mart may have had thousands

Judicial Watch, Inc. FOIA Request
June 6, 2006
Page 6

of Code V letters sent to them[1], and the public deserves to know how many other companies are similarly situated by practice.

Once Judicial Watch obtains the requested records, it intends to analyze them and disseminate the results of its analysis, as well as the records themselves, as a special written report. Judicial Watch will also educate the public via radio programs, Judicial Watch's website, and/or newsletter, among other outlets. It also will make the records available to other members of the media or researchers upon request. Judicial Watch has a proven ability to disseminate information obtained through FOIA to the public, as demonstrated by its long-standing and continuing public outreach efforts, including radio and television programs, website, newsletter, periodic published reports, public appearances, and other educational undertakings.

Finally, disclosure of the requested records will contribute significantly to the public's understanding because relatively little is known about the nature of the Social Security Administration's Code V letter program, nor its implication on the Earnings Suspense File. The records requested by Judicial Watch undoubtedly will shed additional light on this important matter.

Given these compelling circumstances, Judicial Watch is entitled to a public interest fee waiver of both search costs and duplication costs. Nonetheless, in the event our request for a waiver of search and/or duplication costs is denied, Judicial Watch is willing to pay up to $350.00 in search and/or duplication costs. Judicial Watch requests that it be contacted before any such costs are incurred, in order to prioritize search and duplication efforts.

We look forward to receiving the requested documents and a waiver of both search and duplication costs within twenty (20) business days.

Sincerely,

JUDICIAL WATCH, INC.

Christopher J. Farrell

---

[1] Mehata et al. 2003. "Social Security Administration's No-Match Letter Program: Implications for Immigration Enforcement and Workers' Rights". University of Illinois Chicago (Center for Urban Economic Development). Pg. 9

```
**********************
***   TX REPORT   ***
**********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 3539 |
| CONNECTION TEL | 9*818*1p410p966p4304 |
| CONNECTION ID | |
| ST. TIME | 06/06 18:14 |
| USAGE T | 01'57 |
| PGS. SENT | 7 |
| RESULT | OK |

# Fax

## Judicial Watch

To: Social Security Administration   From: Judicial Watch

Fax: 410 966 4304   Date: 6/6/06

Phone:   Pages: 7

Re: Freedom of Information Act request

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply

**Comments:** If you do not receive all pages, please call 202-646-5172

# Exhibit 2



# SOCIAL SECURITY

Refer to:
S9H: PN0463                                    June 29, 2006


Judicial Watch, Inc.
Mr. Christopher J. Farrell
501 School Street, SW
Suite 500
Washington, DC 20024


Dear Mr. Farrell:

This is in response to your Freedom of Information Act (FOIA) request, dated June 6, 2006, for all records detailing the top 100 U.S. employers receiving the highest number of Social Security number mismatches, as described by the Social Security Administration's Code V letter program ("EDCOR"). You specifically seek a listing of the top 100 U.S. employers by number of "no match" instances/notifications from January 1, 2001 to the present.

We cannot comply with your request for the above information. "No-match" instances/notifications are considered tax return information which the Internal Revenue Code (IRC) prohibits SSA from disclosing. We receive employment information from tax returns filed with the Internal Revenue Service (IRS). "No-match" instances/notifications are generated by SSA based on employment information SSA receives from the IRS. Under the IRC, this information is considered to be tax return information (26 U.S.C. § 6103). The IRC generally prohibits us from disclosing this information for other than Social Security purposes. The FOIA does not require disclosure when another law prohibits it (5 U.S.C. § 552(b)(3)).

There is no fee for processing this request.

If you disagree with this decision, you may request a review. Mail your appeal within 30 days after you receive this letter to the Executive Director for the Office of Public Disclosure, Social Security Administration, 6401 Security Boulevard, Baltimore, Maryland 21235. Mark the envelope "Freedom of Information Appeal."


                                        Sincerely,

                                        Willie J. Polk

                                        Willie J. Polk
                                        Freedom of Information Officer

SOCIAL SECURITY ADMINISTRATION
6401 SECURITY BLVD
BALTIMORE MD 21235-6401

OFFICIAL BUSINESS



200248278⊄ 0001





UNITED STATES POSTAGE
U.S. OFFICIAL MAIL
PENALTY FOR
PRIVATE USE $300
$ 00.39⁰
02 1A
0004204710
JUL 03 2006
MAILED FROM ZIP CODE 21235
PITNEY BOWES

```
                    ***********************
                    ***    TX REPORT    ***
                    ***********************

        TRANSMISSION OK

        TX/RX NO              3806
        CONNECTION TEL            9*818*1p410p966p0869
        CONNECTION ID
        ST. TIME             08/02 13:08
        USAGE T              05'16
        PGS. SENT              17
        RESULT               OK
```

501 School Street, SW
Suite 500
Washington, DC 20024
Tel: 202-646-5172
Fax: 202-646-5199
www.JudicialWatch.org



# Fax

| | | | |
|---|---|---|---|
| **To:** | Mr. Jonathan Cantor | **From:** | Chris Farrell |
| **Fax:** | 410-966-0869 | **Pages:** | 17 |
| **Phone:** | | **Date:** | 8/2/2006 |
| **Re:** | FOIA APPEAL | **CC:** | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☒ Please Reply   ☐ Please Recycle

**• Comments:**



# SOCIAL SECURITY

Refer to:
S9H: PO9932

October 16, 2006

Judicial Watch, Inc.
Mr. Christopher J. Farrell
501 School Street, SW
Suite 500
Washington, DC 20024

Dear Mr. Farrell:

I am responding to your Freedom of Information Act (FOIA) appeal of August 2, 2006, concerning your request for a listing of the top 100 U.S. employers by number of "no match" instances/notifications from January 1, 2001 to the present.

After careful review, I agree with Mr. Polk's decision. As stated, we cannot comply with your request for the above information. We cannot agree with your conclusion that this information is not "tax return information". Employers file the Internal Revenue Service (IRS) Form W-2 (Wage and Tax statement) for their employees with the Social Security Administration (SSA). The Forms W-2 are tax return information; SSA processes them under an agreement with the IRS. See 42 U.S.C. § 432. In certain instances, the information on a Form W-2 submitted by an employer does not match SSA records. SSA notifies the employer. That is, SSA notifies the employer of an error on the tax return document. A notice to the employer that there may be an error in the Social Security number (SSN) or name on the tax return document is frequently known as a "no match" letter.

Any information on the tax return, including whether or not a tax return was even filed, is considered to be tax return information. See 26 U.S.C. § 6103(b)(2). As such, SSA cannot disclose to the public the names of any employers that have filed tax returns or any information about whether there may have been errors on such tax returns. The Internal Revenue Code (IRC) allows SSA to use this information for Social Security purposes and does not allow its release for other purposes. Under the IRC, this information is considered to be tax return information (26 U.S.C. § 6103). As previously stated, the IRC generally prohibits us from disclosing this information. The FOIA does not require disclosure when another law prohibits it (5 U.S.C. § 552(b)(3)).

Although you draw parallels between the information found in two SSA Office of the Inspector General (OIG) audit reports posted on the internet to the information you are seeking under the FOIA, the legal framework under which those reports are issued has a significant impact on the outcome. The major difference is that the information gathered by the OIG in its internal reviews of SSA operations is designed to help SSA eliminate fraud, waste and abuse in Agency programs. OIG's mission is to strive for continual improvement in SSA's programs, operations and management. To accomplish this mission, the OIG directs, conducts and supervises audits, evaluations and investigations relating to SSA's programs and operations. Under the audit process, the OIG has access to tax return information as part of its function of helping SSA eliminate fraud, waste and abuse in Agency programs. Therefore, your conclusion that the summarized information related to "no match statistics" that are made available in these reports can and should be disclosed under the FOIA is not correct.

This is our final decision in this matter. If you still believe the decision is incorrect, however, the law permits you to seek review in a district court of the United States.

Sincerely,


Jonathan R. Cantor
Executive Director
Office of Public Disclosure