**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-2034 RWR |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIAL SECURITY ADMIN., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S CROSS-MOTION**
**FOR SUMMARY JUDGMENT**

Plaintiff Judicial Watch, Inc. ("Judicial Watch"), by counsel and pursuant to Rule 56(c)

of the Federal Rules of Civil Procedure, respectfully submits its reply in support of its cross-

motion for summary judgment against Defendant Social Security Administration ("SSA").  As

grounds therefor, Judicial Watch states as follows:

**MEMORANDUM OF LAW**

This case is about SSA's continued misunderstanding and stubborn refusal to comply

with the law.  In SSA's initial denial of Judicial Watch's June 6, 2006 Freedom of Information

Act ("FOIA") request, SSA refused to comply with the request because it asserted that the

records at issue were "tax return information which the Internal Revenue Code (IRC) prohibits

SSA from disclosing."  *See* June 29, 2006 Letter from Willie J. Polk, Freedom of Information

Officer, Exhibit 2 to the Declaration of Ethel Burrows (Doc. No. 9).  Judicial Watch's

administrative appeal clearly differentiated the records it sought from return information.

Nonetheless, SSA's denial of the administrative appeal parroted its initial determination, and

1

SSA once again asserted that the records sought were tax return information.  *See* October 16,

2006 letter from Jonathan R. Cantor, Executive Director, Office of Public Disclosures, Exhibit 2

to Burrows Decl.[1]  In its opposition, SSA continues to assert that, not only is it not obligated to

produce the records sought by Judicial Watch, but it dos not even have to search for them.

Judicial Watch's cross-motion for summary judgment should be granted and SSA should be

ordered to comply with the law.

## SUMMARY OF THE ARGUMENT

The records sought by Judicial Watch in this case -- a list of the top 100 employers who

receive the most no-match letters -- do not constitute return information under 26 U.S.C. § 6103.

Rather, the records are statistical compilations that in no way reveal any taxpayer data.  SSA is

not prohibited by the Internal Revenue Service ("IRS") from disclosing such records, and

therefore, SSA cannot assert FOIA Exemption 3 to withhold the records.  And, in fact, SSA has

asserted in another case that it no longer considers no-match information to be return

information.  *See Davis v. Social Security Administration*, 281 F. Supp. 2d 1151, 1156 (N.D. Cal.

2003).

In addition, in all but the most extraordinary circumstances, it is an agency's obligation

upon receipt of a FOIA request to search for records responsive to the request.  SSA's refusal to

---

[1]    In a sworn declaration submitted by SSA, Mr. Cantor states that he "personally reviewed" Judicial Watch's June 6, 2006 request, and, upon review, he "concluded after discussion with my staff that the documents are considered tax return information ... Further, I determined no search was necessary."  Declaration of Jonathan R. Cantor ("Cantor Decl.") at ¶ 4. It was also Mr. Cantor who considered Judicial Watch's appeal.  It strikes Judicial Watch as odd that the same individual who considered Judicial Watch's request would also consider its administrative appeal.  Having the same agency official who denied a request also review an appeal from that denial would seem to divest a requestor of any meaningful appellate review.

conduct a search in this case also constitutes a clear violation of FOIA.  In *Church of Scientology v. IRS*, 792 F.2d 146, 151-52 (D.C. Cir. 1986), the Court cautioned against permitting a government agency to presume that an entire universe of records was exempt, thereby relieving the agency of its obligation to search.  SSA's assertion runs contrary to this clear ruling.

Lastly, Congress' 1996 amendment to FOIA's definition of the term "record" requires SSA to process Judicial Watch's request and to produce the responsive material in "any form or format requested" by Judicial Watch as long as the requested format is "readily producible by the agency in that form or format."  5 U.S.C. § 552(a)(3)(B); Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231, 110 Stat. 34048, 3049 (codified as amended at 5 U.S.C. § 552(f)(2)) ("E-FOIA Amendment").  SSA's assertion of a "burden" does not exempt SSA of its obligation to produce the responsive records.

## ARGUMENT

### I.    The Records Sought By Judicial Watch Are Not Return Information.

The records at issue in this case -- a list of the top 100 U.S. employers receiving the highest number of Social Security number mismatches, or "no-match" letters -- are not return information.  Applying the statutory definition of "return information" demonstrates this very clearly.  *See* 26 U.S.C. § 6103(b).[2]  Such a list would not reveal any taxpayer's identity or any other identifying information, such as a social security number.  Nor would it reveal any taxpayer's income or tax assessment or liability.  Rather, the list is merely a statistical

---

[2]        SSA's reply memorandum also makes reference to "26 U.S.C. § 6301(b)(2)(A)."  However, Judicial Watch is fairly certain that this is a misprint.

compilation of information consisting of no more than the names of businesses, and, perhaps, addresses.

The prohibition against disclosing "return information" simply does not apply to statistical compilations -- even compilations of tax information. *See* 26 U.S.C. § 6103(a). The U.S. Supreme Court clearly held that "statistical studies and other compilations of data" prepared by the IRS are subject to FOIA. *Church of Scientology v. IRS*, 484 U.S. 9, 16 (1987). This is precisely what Judicial Watch seeks in this case. Judicial Watch is not seeking redacted versions of W-2 and W-3 forms, but, rather, seeks only compilations of statistical data. SSA utterly fails to address how Judicial Watch's request does not fall squarely within the Supreme Court's holding in *Church of Scientology*.[3] It is also clear from the Supreme Court's holding in *Church of Scientology* that compilation of statistical data can be composed of actual tax data and nonetheless be subject to FOIA. SSA's assertion that the lists sought in this case are exempt *per se* because they contain information garnered from employee W-2 and W-3 forms is incorrect.

In addition, while Judicial Watch does not contest the fact that employers are legally obligated to submit tax data about their employees to the SSA, this obligation stems from their role as employers, not their role as taxpayers. It is erroneous to equate, as the SSA does, an employer's reporting obligations *vis-a-vis* its employees with any separate obligation it might have as a taxpayer. Memorandum of Points and Authorities in Support of Defendant's Motion For Summary Judgment ("Reply Mem.") at 4. Revealing an employer's name in the context of

---

[3]    Despite failing to explain how *Church of Scientology* differs from Judicial Watch's request, SSA does admit that statistical compilations of data are exceptions. Reply Mem. at 4-5. Any suggestion that "no-match" lists are not statistical compilations is either disingenuous or reflective of a deep misunderstanding of the law.

4

producing a statistical compilation cannot be equated with disclosing taxpayer return information

for purposes of 26 U.S.C. § 6103(a).

SSA also attempts to sidestep the real issue presented in *Davis, Cowell & Bowe, LLP v.

SSA*, 281 F. Supp. 2d 1154 (N.D. Cal. 2003) by relying on an erroneous distinction.  SSA does

not dispute that, in *Davis*, it represented to the court that disclosure of the information sought by

the plaintiff was not prohibited by 26 U.S.C. § 3106.  Reply Mem. at 5.  Rather, SSA asserts that,

because the plaintiff in *Davis* sought information different from Judicial Watch, SSA's refusal to

release records in this case is not contradicted by its statement to the court in *Davis*.  SSA's

purported factual distinction fails, however, because it is wrong.

In its reply, SSA asserts that *Davis* is inapposite because "that case did not involve the

filing of W-2 and W-3 forms."  Reply Mem. at 2.  SSA further asserts that "undersigned counsel

has been advised by SSA that the *Davis* case involved a FOIA request for information that was

supplied" through its voluntary system.  *Id.* at 6.[4]  This is simply not the case.  In its May 17,

2002 opinion, the court described the background of *Davis* as follows:

> The records sought entail information derived from the Internal Revenue Service
> W-2 and W-3 forms filed with the SSA. ... Under CAWR [Combined Annual
> Wage Reporting], employers report the amount of wages paid, the amount of
> FICA withholdings and other information for each of their employees by filing
> IRS W-2 (and in some cases W-3) forms with the SSA.

---

[4]    Curiously missing from SSA's reply and exhibits is any sworn statement from an
SSA official asserting the fact that *Davis* was not based on a request involving W-2 and W-3
forms.  The second Declaration of Charles Litpz does explain the difference between the
voluntary (SSNVS) and mandatory (AWR) systems, but fails to give authority to the statements
regarding *Davis*.

*Davis, Cowell & Bowe, LLP v. SSA*, 2002 U.S. Dist. LEXIS 9548, * 2-3 (N.D. Cal May 17, 2002). Contrary to SSA's suggestion, *Davis* clearly involved information garnered from W-2 and W-3 forms.

Lastly, the court in *Davis* distinguished its holding regarding the plaintiff's request for "return information" from a request for records "such as a report showing aggregate numbers of no match letters sent to a particular employer within a given year." *Id.* at *25, n.4. The records at issue in *Davis* were not statistical compilations like the records sought by Judicial Watch, but instead were records that included "specific employee identifying information: names and/or social security numbers." *Id.* at *23.

## II.    SSA Is Required By Law to Search.

SSA continues to maintain that it is not even required to search for records responsive to Judicial Watch's request. However, SSA's assertion is based on the faulty notion that the records sought at issue constitute return information. As demonstrated above, the records sought by Judicial Watch are statistical compilations of information, not return information. *See* Section I, *supra*.

Additionally, and also contrary to SSA's assertion, *Church of Scientology v. IRS*, 792 F.2d 146, 151-52 (D.C. Cir. 1986) does not excuse SSA's failure to search. In *Church of Scientology*, the Court cautioned the IRS not to assume or presume that all of its records are return information. 792 F.2d at 151. The same caution applies to SSA in this case. SSA has not even searched for, and therefore does not actually know, what a search for responsive records would yield. SSA's assumption that all of its records are exempt from production is contrary to longstanding precedent.

6

By way of example, SSA now appears to try to "clarify" the affidavit it submitted to the Court in support of its original summary judgment motion. In the declaration submitted by Mr. Charles Litpz in support of SSA's motion, Mr. Liptz testified, "to my knowledge there is no other document that would list the employers by the most no matches." Declaration of Charles Liptz, dated March 30, 2007, at ¶ 22.[5] SSA relied on Mr. Liptz's Declaration to argue that, despite having failed to conduct a search, SSA had only one document responsive to Judicial Watch's request, a compilation of no-match data from 2002. *See* Reply Mem. at 6.

In the Declaration of Jonathan R. Cantor, submitted by SSA with its reply/opposition to Judicial Watch's cross-motion, Mr. Cantor testified that SSA's Office of Inspector General possesses two audit reports and related working papers responsive to Judicial Watch's request. Declaration of Jonathan R. Cantor at ¶¶ 12-13. Obviously, Mr. Litpz's belief on March 30, 2007 has been proven to be wrong. As the Supreme Court cautioned in *Church of Scientology*, assumptions, presumptions, and beliefs are no substitute for an actual search.[6] SSA must be required to search for all responsive records, and only then can any claims of exemption be fairly adjudicated.

---

[5]    SSA submitted a declaration executed by Mr. Liptz, dated June 15, 2007, with its reply/opposition to Judicial Watch's cross-motion.

[6]    Ironically, despite having proven Mr. Litpz's "belief" to be mistaken, Mr. Cantor makes a similar profession of belief that no other SSA office would have responsive records. Declaration of Jonathan R. Cantor at ¶ 14.

**III.    SSA Has a Duty to Produce Responsive Records.**

Judicial Watch demonstrated in its opposition to SSA's motion for summary judgment and accompanying cross-motion that the 1996 E-FOIA Amendment obligates SSA to produce responsive data in "any form or format requested by the person if the record is readily producible by the agency in that form or format." 5 U.S.C. § 552(a)(3)(B); *see also* Plaintiff's Cross-Motion For Summary Judgment and Opposition to Defendant's Motion For Summary Judgment at 12-13.[7]  It is difficult to determine whether SSA contests the applicability of the E-FOIA Amendment.  *See*, *e.g.*, Reply Mem. at 9-10.  SSA continues to rely on *Krohn v. Dep't of Justice*, 628 F.2d 195, 197-98 (D.C. Cir. 1980), despite the subsequent statutory amendment.  Reply Mem. at 9.  Nonetheless, the E-FOIA Amendment clearly is applicable to this case.

SSA asserts that the 1996 E-FOIA Amendment only requires an agency "to make 'reasonable efforts' to search for requested records in electronic form or format 'except when such efforts would significantly interfere with the operations of the agency's automated information system.'" Reply Mem. at 10; *see also* 5 U.S.C. § 552(a)(3)( C ).  SSA does not, however, assert that production of responsive data would cause a significant interference with the operations of SSA's automated information system.  Rather, SSA only asserts that the search would be "sufficiently burdensome."  Reply Mem. at 10.  This does not satisfy SSA's obligation under the E-FOIA Amendment.  That a search may be "burdensome" is not the same as a search

---

[7]    The D.C. Circuit has defined "readily producible" to mean "an agency's technical capability to create the records in a particular format."  *Sample v. Bureau of Prisons*, 466 F.3d 1086, 1088 (D.C. Cir. 2006).

causing a "significant interference with the operations of the agency's automated information system."[8]  SSA should be required to produce the requested data.

SSA should be required to immediately produce *all reports* identified by SSA as already existing in the format sought by Judicial Watch.  SSA previously identified a 2002 report.  *See* Defendant's Statement of Material Facts As to Which There Is No Genuine Issue at ¶ 11 (Doc. No. 9); Declaration of Charles Liptz, dated March 30, 2007, at ¶¶ 20-21.  Despite its sworn affidavit, SSA now acknowledges that it produced "two audit reports" that are responsive, as well as the "working papers containing [the] tax information used to create the reports."  Cantor Decl. at ¶ 13.  However, the actual October 2004 audit report, attached hereto as Exhibit 1, clearly states that in 2004, SSA "created a new Top 100 list of employers using the same criterion used in our two prior Top 100 reports."  Exhibit 1 at 9.[9]  Therefore, SSA has not one, but at the very least three responsive documents; documents prepared by the SSA in the format requested by Judicial Watch.[10]  SSA should be required to produce all of the reports identified.

---

[8]      SSA's sworn declarations also fail to demonstrate that Judicial Watch's request would cause significant interference with the operations of SSA's automated information system. Mr. Liptz's March 30, 2007 declaration states that SSA would have to "manually program and run an assortment of software routines" to produce the responsive records.  *See* Declaration of Charles Liptz, dated March 30, 2007, at ¶ 4.  Mr. Liptz's Declaration provides estimates of the amount of time it would take to produce the information electronically.  Even if Mr. Liptz is correct in his estimates, the fact that a search is time-consuming is not a statutorily permitted exception to SSA's obligation to search.  There is simply no evidence presented by SSA demonstrating that Judicial Watch's request would cause significant interference with the operations of SSA's automated information system.

[9]      SSA's 2004 publicly available audit report does not include page numbers.  To assist the Court in locating the relevant information, Judicial Watch placed page numbers on the document.

[10]     Not only does this fact place the accuracy of SSA's sworn affidavits in jeopardy, it furthers demonstrates that SSA's "belief" of what records it possesses is unreliable absent

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons set forth in Judicial Watch's opposition/cross-motion, SSA's motion for summary judgment should be denied and summary judgment should be entered in Judicial Watch's favor. SSA should be ordered to conduct a reasonable search for responsive records and produce any and all such records, as well as the previously identified reports, to Judicial Watch without exemption and without further delay. SSA also should be required to generate and produce any and all responsive data to Judicial Watch pursuant to the provisions of the E-FOIA Amendment, again without exemption and without further delay.

Dated:  July 25, 2007

Respectfully submitted,

JUDICIAL WATCH, INC.

 /s/ Paul J. Orfanedes
D.C. Bar No. 429716
Meredith L. Di Liberto
D.C. Bar No. 487733
Suite 500
501 School Street, S.W.
Washington, DC 20024
(202) 646-5172

*Attorneys for Plaintiff*

---

undertaking an actual search.

EXHIBIT 1

OFFICE OF
THE INSPECTOR GENERAL

SOCIAL SECURITY ADMINISTRATION

EMPLOYERS WITH THE MOST
SUSPENDED WAGE ITEMS IN THE
5-YEAR PERIOD 1997 THROUGH 2001

October 2004 A-03-03-13048

AUDIT REPORT

Mission

We improve SSA programs and operations and protect them against fraud, waste, and abuse by conducting independent and objective audits, evaluations, and investigations. We provide timely, useful, and reliable information and advice to Administration officials, the Congress, and the public.

Authority

The Inspector General Act created independent audit and investigative units, called the Office of Inspector General (OIG). The mission of the OIG, as spelled out in the Act, is to:

☐ Conduct and supervise independent and objective audits and investigations relating to agency programs and operations.
☐ Promote economy, effectiveness, and efficiency within the agency.
☐ Prevent and detect fraud, waste, and abuse in agency programs and operations.
☐ Review and make recommendations regarding existing and proposed legislation and regulations relating to agency programs and operations.
☐ Keep the agency head and the Congress fully and currently informed of problems in agency programs and operations.

To ensure objectivity, the IG Act empowers the IG with:

☐ Independence to determine what reviews to perform.
☐ Access to all information necessary for the reviews.
☐ Authority to publish findings and recommendations based on the reviews.

Vision

By conducting independent and objective audits, investigations, and evaluations, we are agents of positive change striving for continuous improvement in the Social Security Administration's programs, operations, and management and in our own office.

Exhibit 1 Page 1

MEMORANDUM

Date: October 26, 2004 Refer To:

To: The Commissioner

From: Acting Inspector General

Subject: Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001 (A-03-03-13048)

OBJECTIVE

Our objectives were to (1) identify the 100 employers responsible for sending the most wage items to the Earnings Suspense File (ESF) in the 5-year period 1997 through 2001 and (2) identify patterns of errors and irregularities in wage reporting or other reasons for the large number of ESF items for the 100 employers during that time period.

BACKGROUND

The Social Security Administration (SSA) is responsible for maintaining accurate individual earnings records. Employers annually report their employees' earnings on a Wage and Tax Statement (Form W-2). When an employee's name and/or Social Security number (SSN) does not match SSA's records, the reported wages cannot be posted to an individual's earnings record and are recorded in the ESF. SSA attempts to match the earnings recorded in the ESF to the individual who earned them, and if successful, post the earnings to the Master Earnings File (MEF). Wages in the ESF can affect an individual's Social Security benefits. Earnings posted to the MEF are used by SSA to determine eligibility for retirement, survivors, disability, and health insurance benefits and to calculate benefit amounts. If earnings are not properly posted to an individual's earnings record, the person will not receive credit for them. As of October 2003, the ESF accumulated about $421 billion in wages and 244 million wage items for Tax Years (TY) 1937 through 2001. The 5-year period in our review represents approximately $200 billion in accumulated wages and about 41 million wage items.

This is our third report related to employers responsible for sending the most wage items to the ESF. Our September 1999 audit reviewed wage items submitted to the ESF during TYs 1993 to 1996. Our October 2003 audit assessed the status of the employers we identified in the 1999 audit. See Appendix B for more information on these earlier audits.

Our audit did not include an evaluation of SSA's internal controls over the wage reporting process, nor did we attempt to establish the reliability or accuracy of the wage data. When appropriate, we used the same methodology used in our prior related audits. We provide information on our scope and methodology in Appendix C. The entity audited was SSA's Office of Public Services and Operations Support (OPSOS) under the Deputy Commissioner of Operations and the Office of Earnings, Enumeration and Administrative Systems under the Deputy Commissioner of Systems. We conducted our audit in Baltimore, Maryland and the Office of Audit in Philadelphia, Pennsylvania between August 2003 and March 2004. We conducted our audit in accordance with generally accepted government auditing standards.

RESULTS OF REVIEW

Exhibit 1 Page 2

Our review found that a small number of identifiable employers account for a disproportionate number of ESF items and wages. The 100 employers identified in our audit were responsible for approximately 7 percent of the total ESF items and about 5 percent of the total ESF wages during the 5-year review period. These 100 employers were mainly in three industries: services, restaurants, and agriculture. We also found that the majority of the employers experienced an increase in suspended wages over the 5 year period. In addition, 20 of the 100 employers had more than 60 percent of their reported wage items in the ESF. Furthermore, a review of more than 5,600 employers showed that 37 percent had at least 60 percent of their TY 2001 wage items in the ESF. The Agency has recently developed the Earnings Data Warehouse (EDW), which should assist SSA personnel in identifying problem employers.

TOP 100 EMPLOYERS FOR TAX YEARS 1997 TO 2001

Our review identified the 100 employers responsible for the most wage items in the ESF for TYs 1997 to 2001. These 100 employers, hereinafter called the "Top 100," account for a disproportionate share of the growth of the ESF. Although about 6.5 million employers annually file wage reports, these Top 100 employers were responsible for approximately 7 percent (2.7 million) of the ESF wage items and about 5 percent ($9.6 billion) of the ESF wages for TYs 1997 to 2001 (see Appendix D). We reviewed the wage reporting trends of these Top 100 employers to determine (1) the industries and States represented by these employers, (2) reporting trends over the 5-year period, (3) the percent of their reported wages going into suspense, and (4) the types of errors reported by employers.

Industries and States Represented by Top 100 Employers

Our analysis of the Top 100 employers by industry determined that the highest contributors of items to the ESF were concentrated in three industries: services, restaurants, and agriculture. We found that 95 of the Top 100 employers were in 1 of these 3 industries, representing 2.6 million wage items and over $9.1 billion in wages over the 5-year review period. Forty-three of the Top 100 employers were in the service industry, 32 were in the restaurant industry, and 20 employers were in the agriculture industry. Four of the remaining employers were in the hotel/retail industry, and one was a State agency. See Figure 1 for grouping by industry.

The Top 100 employers were registered with the Internal Revenue Service in 27 States. This address may relate more to payroll issues than the physical location where an employer does most of its business. We found that 54 of the 100 employers had registered addresses in three States – California, Texas, and Illinois – representing almost 1.5 million wage items and over $4.8 billion in wages during TYs 1997 to 2001. These 54 employers were responsible for over 3.5 percent of the wage items and 2.4 percent of the wages sent to the ESF by all employers reporting wages in our audit period. California had the highest number of Top 100 employers, with 25 employers representing about 683,000 wage items and approximately $2 billion in wages during our audit period. See Appendix E for an alphabetical listing of Top 100 employers by State.

Increase in Suspended Wage Items

Our review of the Top 100 employer data also found that the average increase in suspended wage items between TYs 1997 and 2001 was approximately 69 percent. An increase or decrease in suspended wage items for a particular employer could occur for a number of reasons, including a change in the number of employees or even the volume of items moved from the ESF to wage earners' records. Overall, we found that 14 employers showed a decrease in the number of wage items reported between TYs 1997 and 2001. However, 86 of the 100 Top employers showed an increase in suspended wage items (see Figure 2). Six employers experienced an increase of 400 percent or more during this timeframe. For

Exhibit 1 Page 3

example, a Texas employer in the service industry experienced a 1,300 percent increase in suspended wage items over the 5 years. While the employer's payroll also increased during this period, from about 9,000 in FY 1997 to approximately 66,000 in TY 2001 (a 633 percent increase), the increase in suspended items was at a greater rate.

Percent of Wage Items Sent to the Earnings Suspense File

On average, about 8 percent of the wage items reported by the Top 100 employers during TYs 1997 to 2001 were posted to the ESF. However, 20 of the 100 employers each had over 60 percent of their reported wage items in the ESF. Figure 3 summarizes the percent of reported wage items in the ESF among the Top 100 employers.

This high level of suspended wages could relate to a number of scenarios, including problems with the wage reporting software or a workforce using fraudulent documents. In a March 2001 paper, SSA noted that many suspended items involve the agricultural industry, which has transient employees who may not have work authorizations from the Department of Homeland Security. Other high turnover industries, such as restaurants and other service industries, have similar profiles. Frequent job and residential changes are common with members of these workforces.

Of the 20 employers with more than 60 percent of their wages in suspense, 14 employers were in the agriculture industry, with the remainder from the service industry. In the case of the employer with the worst accuracy, SSA suspended 89 percent of the TY 2001 wage items submitted by an agricultural employer located in Florida. This represented 6,709 of the 7,497 wage items submitted by this employer. Furthermore, these suspended wage items represented about 82 percent of the $28.5 million in wages reported by this employer in TY 2001.

Types of Wage Reporting Errors

Of the wage items reported by the Top 100 employers in TY 2001, approximately 622,000 were posted to the ESF. About 159,000 wage items (26 percent) were reported using unassigned SSNs. Unassigned SSNs have not been issued by SSA, and are referred to as impossible numbers. For example, SSA does not issue SSNs that begin with the number "8" or "9." The remaining 74 percent of the ESF items were reported with legitimate SSNs that could not be associated with the name of the Numberholder on SSA's records.

We looked at other trends, such as duplicate SSNs, as well as potential Individual Taxpayer Identification Numbers (ITIN), to see what other types of errors may have been introduced. We found some items that met this criterion. For example, 18,896 SSNs were used 2 or more times at the same employer. We acknowledge that an employer might issue more than one W-2 to an employee in a given year. Also, we found 1,078 cases where the suspended wage item had a number very similar to an ITIN.

REPORTING ACCURACY AMONG OTHER EMPLOYERS

We also analyzed the wage reporting of all employers with 200 or more wage items in the ESF for TY 2001. In TY 2001, about 6.5 million employers filed wage reports, with approximately 730,000 employers reporting at least one wage item later posted to the ESF. We identified 5,689 employers

Exhibit 1 Page 4

meeting the 200 or more suspended wage items criteria. These 5,689 employers submitted about 4 million suspended wage items and over $17.2 billion in suspended wages. Although the 5,689 employers meeting our criteria were a very small percentage of both groups (.1 percent of the 6.5 million employers and .8 percent of the 730,000 employers submitting at least one suspended item), they contributed over 41 percent of the wage items and about 30 percent of the wages posted to the ESF for TY 2001.

Our analysis of the employer data also determined that 2,118 of the 5,689 employers (37 percent) had at least 60 percent of their reported wage items posted to the ESF. We provide a breakout of the reporting results of all 5,689 employers in Figure 4.

As noted earlier, these reporting accuracy problems can occur for a variety of reasons. However, regardless of the cause, the employees will not get credit for their earnings. A New Jersey labor service employer had 96 percent of its reported TY 2001 wage items, or 2,177 wage items, posted to the ESF. These suspended items represented over $6.8 million in wages that went to the ESF. Another service industry employer, a security guard service in California, had almost 49 percent of its reported wage items posted to the ESF in TY 2001. This employer reported 8,902 wage items, of which 4,321 did not match SSA's records and were posted to SSA's ESF. As a result, this employer posted more than $27 million in wages to the ESF.

SSA CORRECTIVE ACTIONS

Our analysis of reporting trends would assist SSA's Employer Service Liaison Officers (ESLO) in resolving wage-reporting problems. SSA maintains ESLOs in SSA regions throughout the United States to: (1) answer employers' questions on wage reporting submissions; (2) encourage employers to use SSA's various programs, such as the Employee Verification Service; (3) conduct wage-reporting seminars, in partnership with the IRS, for employers, payroll service providers and payroll software companies; and (4) contact employers with significant suspended wage items in their regions. As we noted in our October 2003 audit, each year the OPSOS develops a national listing of employers who submit 100 or more suspended wage items. These lists are sent to regional ESLOs for follow-up contacts with the employers. SSA does not direct the ESLOs to contact specific employers or follow-up with the ESLOs regarding what contacts were made and the results of the contacts. Nor does OPSOS provide the ESLOs with a listing showing the percent of an employer's payroll posted to the ESF.

Our analysis provides a number of additional ways to review the reporting trends of employers, including changes in the volume of wage items in suspense as well as the percent of an employer's payroll in the ESF. If the ESLOs knew the reporting trends for the employers in their region, it could assist them in focusing their outreach efforts. SSA is developing an EDW, which could provide such statistics to the ESLOs, as well as other useful data. Among other things, the EDW was designed to provide management with trend data on employer wage reporting (see Appendix F). Hence, the EDW should be able to produce a listing of employers showing their wage reporting accuracy.

Employer reporting trends could also be useful to the IRS were it to assess penalties on employers submitting inaccurate names/SSNs in their wage reports. In fact, in August 2002 SSA provided a listing to the IRS of all the employers with more than 100 items in the ESF, and sorted this list by the number of items in suspense as well as percent of payroll in suspense. For more information on the IRS efforts to assess penalties on employers, see Appendix G.

CONCLUSIONS AND RECOMMENDATIONS

Exhibit 1 Page 5

SSA needs to maintain continued diligence to slow the growth of the ESF. Many of the largest contributors to the ESF are identifiable within SSA's systems, repeatedly submit inaccurate wage reports, and are in specific industries such as services, restaurants, and agriculture. Directing assistance efforts at the employers with the more significant reporting problems would best use the ESLO's limited resources. SSA's EDW, when fully functional, should be a useful tool in analyzing and resolving wage reporting problems. SSA can develop more meaningful statistics for ESLOs once the EDW is fully functional.

We recommend that SSA:

1. Create centralized EDW reports, after considering ESLO input, that assist ESLOs with identifying problematic employer reporting trends, such as increases in the volume of wage items in suspense as well as the percent of an employer's payroll in the ESF.

2. Ensure ESLOs consider employer reporting trends created by EDW as part of their criteria in identifying employers for assistance through periodic monitoring from Headquarters.

AGENCY COMMENTS

The Agency agreed partially with our first recommendation, stating that it would work with individual ESLOs in determining their reporting needs and requirements including the method of delivery. The Agency stated that the EDW can identify employers with large numbers of ESF items or larger percentages of W-2 data on the ESF. However, identifying the percentage of an individual employer's payroll in the ESF would require systems modifications to the Annual Wage Reporting (AWR) system. These modifications require approval by the Agency's Information Technology Advisory Board.

The Agency also partially agreed with our second recommendation, agreeing to use the EDW when identifying employers requiring wage reporting assistance. In addition, the Agency will continue working with the regional ESLOs in addressing the Agency's ESF goals, but will not directly monitor the ESLOs efforts from Headquarters.

OIG RESPONSE

In regards to our first recommendation, we appreciate that the Agency will work with individual ESLOs in determining their reporting needs and requirements, including the method of delivery. Regarding the systems modifications required to identify specific employer reporting accuracy rates, we feel these modifications would be productive and should be considered. Having the AWR system identify problematic employer trends and sharing this information with the EDW would put useful data in the hands of the EDW customers. One of the stated goals of the EDW is that it will allow users to access different views of earnings data, including analyzing wage reporting data received by SSA.

In reference to our second recommendation, we agree that the EDW will be useful in identifying employers with wage reporting problems. The Agency expects the EDW to provide historical and trend earnings data to support SSA's business needs, and assist SSA in providing quality service to customers. In view of the varying staffing levels and different job duties of the regional ESLOs, we still believe Headquarters should monitor ESLO efforts in this area to ensure employer trends are being considered in their outreach efforts. In addition, such monitoring could assist the various ESLOs to share best practices and other useful information.

Exhibit 1 Page 6

S
Patrick P. O'Carroll, Jr.

Appendices

APPENDIX A – Acronyms

APPENDIX B – Background on Earlier Audit Findings

APPENDIX C – Scope and Methodology

APPENDIX D – Top 100 Employers for Tax Years 1997 to 2001-- Earnings Suspense
File Wage Items

APPENDIX E – Alphabetical Listing of Top 100 Employers by State

APPENDIX F – Earnings Data Warehouse

APPENDIX G – Status of Internal Revenue Service Efforts to Monitor Employers

APPENDIX H – Prior Office of the Inspector General Reports

APPENDIX I – Agency Comments

APPENDIX J – OIG Contacts and Staff Acknowledgments


Appendix A
Acronyms
EDW Earnings Data Warehouse

EIN Employer Identification Number

ESF Earnings Suspense File

ESLO Employer Service Liaison Officer

ITIN Individual Taxpayer Identification Number

IRS Internal Revenue Service

MEF Master Earnings File

OIG Office of the Inspector General

OPSOS Office of Public Services and Operations Support

Exhibit 1 Page 7

SSA Social Security Administration

SSN Social Security Number

TIGTA Treasury Inspector General for Tax Administration

TY Tax Year

U.S.C. United States Code

Forms:

W-2 Wage and Tax Statement

W-4 Employee's Withholding Allowance Certificate


Appendix B
Background on Earlier Audit Findings

TOP 100 AUDIT FINDINGS, SEPTEMBER 1999

In our September 1999 audit, we noted that 84 of the 100 employers experienced increases in suspended wage items over the 4-year period, Tax Years (TY) 1993 to 1996, including 27 employers with increases of 100 percent or more.

Patterns of reporting errors and irregularities exhibited by the 100 employers included the following.

• Ninety-six employers reported 109,360 Social Security numbers (SSN) never issued by the Social Security Administration representing about $298.5 million in suspended wages.

• Thirty-six employers reported 3,127 of the 109,360 unassigned SSNs as "000 00-0000."

• Ninety-four employers reported duplicate mailing addresses for 3 or more employees, involving 72,770 suspended Wage and Tax Statements (Form W-2) or 21 percent of the 340,922 suspended wage items for these employers in 1996. Suspended wages involving duplicate addresses totaled about $193.7 million.

• Eighty-six employers reported 3 or more consecutively numbered SSNs involving 4,910 W-2s and $14.4 million in suspended wages. We defined consecutive SSNs as those where the first six digits were identical.

• Sixty-nine employers reported 16,742 identical W-2s, representing $31.1 million in suspended wages, that were used 2 or more times by employees working for the same employer.


TOP 100 FOLLOW-UP AUDIT FINDINGS, OCTOBER 2003

Our 2003 Office of the Inspector General follow-up audit analyzed the wage reporting of the original Top 100 employers for TYs 1997 to 2000. We found that of the original 100 employers identified in the

Exhibit 1 Page 8

prior review, 40 were still among the Top 100 employers with the most suspended wage items and the remaining 60 were not. Of the 60 employers no longer on the Top 100 listing, 14 had increased wage reporting accuracy, 19 had decreased wage reporting accuracy, and the remaining 27 employers did not have sufficient wage items in the follow-up period to calculate their reporting accuracy. We found that some of the employers no longer on the Top 100 list were reporting their wages under different Employer Identification Numbers. In addition, it is possible that some of these employers were no longer in business.

Appendix C
Scope and Methodology

To meet our objectives, we performed the following steps.

• Reviewed prior Social Security Administration (SSA) Office of the Inspector General and Treasury Inspector General for Tax Administration reports and other materials related to the Earnings Suspense File (ESF) and inaccurate wage reporting.

• Reviewed SSA policies and procedures for maintaining individual earnings records and contacting employers with suspended wages.

• Created a new Top 100 list of employers using the same criteria used in our two prior Top 100 reports. We identified all employers who contributed 200 or more wage items to the ESF in each of the 5 years in our review, Tax Years (TYs) 1997 to 2001. We found 1,565 employers met this criterion. Using this data, we selected the 100 employers who had the most suspended wage items in our 5 year review period. We then obtained the total dollar amounts associated with the suspended wage items. Finally, we obtained the total number of 1) wage items and 2) wages reported by these 100 employers for the 5-year review period.

• Identified the total number of employers with 200 or more ESF items for only TY 2001 and obtained similar data for these firms. There were 5,689 employers meeting this criterion.

• For both employer groups above, calculated the percentages of reported 1) wage items and 2) wages posted to the ESF for each of the employers. For the Top 100 employers, we also identified the number of assigned and unassigned Social Security numbers (SSN) reported in TY 2001, and other wage reporting trends and irregularities.

• Reviewed available information pertaining to SSA's Earnings Data Warehouse (EDW) and interviewed SSA employees involved in administrating the EDW.

• The following are some important factors regarding the methodology used in our review that need to be considered:

☐ The list is based on wage items reported under an Employer Identification Number (EIN), and some employers report under multiple EINs. Hence, while the trends noted in the audit relate to the EIN, they do not necessarily give a complete picture of the employer. However, SSA's systems maintain the wage data under EINs and do not allow us to focus on individual employers. As a result, the audit is identifying the 100 EINs with the most suspended wage items and not necessarily the 100 employers with the most suspended wage items.

Exhibit 1 Page 9

☐ Employers are allowed to switch their EINs for wage reporting. As a result, we found instances where wages were reported under different EINs over the 5-year period. If a company switched EINs between 1997 and 2001, it may have failed to report over 200 items in a particular year under a specific EIN and, therefore, never have made the Top 100 employer listing.

☐ Some employers are on the list because of their employment volume rather than significant problems with their reporting accuracy. For example, some employers are reporting only 1 percent of their employees with name/SSN mismatches, but they are on the list because 1 percent of their total payroll is a large number. These employers may not have the same underlying problems as a smaller employer reporting as much as 85 percent of its payroll in error.

• Our audit did not include an evaluation of SSA's internal controls over the wage reporting process. The purpose of our review was to determine how SSA used the wage reporting data the Agency had accumulated. We did not focus our efforts on the collection of wage reporting data, nor did we attempt to establish the reliability or accuracy of such data. In prior audits, we reviewed the completeness and accuracy of the ESF postings, and tested that accuracy of ESF data that was reinstated to correct earnings records.

Appendix D

Top 100 Employers for Tax Years 1997 to 2001-- Earnings Suspense File Wage Items

RANK STATE TAX YEARS (TY) 1997-2001 EARNINGS SUPSENSE FILE (ESF) WAGE ITEMS
TYs 1997-2001 ESF WAGES
SUSPENDED WAGE ITEMS REPORTED
WAGE ITEMS SUSPENDED ITEMS
AS PERCENT
REPORTED ITEMS SUSPENDED WAGES REPORTED WAGES SUSPENDED WAGES AS A PERCENT OF REPORTED WAGES

1 IL 131,991 1,130,180 11.68% $524,933,538 $5,454,058,505 9.62%
2 TX 108,302 737,716 14.68% $532,964,026 $3,059,859,452 17.42%
3 FL 106,073 379,741 27.93% $249,952,871 $860,746,129 29.04%
4 NY 86,243 1,041,002 8.28% $467,508,085 $4,405,111,915 10.61%
5 CA 76,857 373,784 20.56% $358,907,957 $1,962,480,891 18.29%
6 CA 66,103 1,028,743 6.43% $130,438,417 $2,078,211,324 6.28%
7 MI 56,705 3,012,716 1.88% $176,089,925 $13,343,514,290 1.32%
8 KY 50,455 564,788 8.93% $226,043,907 $2,540,935,442 8.90%
9 CA 50,027 659,162 7.59% $178,083,256 $1,769,734,446 10.06%
10 SC 49,158 446,794 11.00% $220,172,981 $1,824,878,432 12.07%
11 GA 45,749 232,441 19.68% $151,314,908 $1,207,707,941 12.53%
12 OK 43,375 1,227,614 3.53% $117,983,189 $2,592,833,629 4.55%
13 CA 39,171 49,978 78.38% $80,219,973 $113,496,931 70.68%
14 NJ 37,302 73,236 50.93% $50,626,511 $94,771,503 53.42%
15 CA 36,458 141,088 25.84% $178,514,463 $685,649,213 26.04%
16 NM 36,455 425,714 8.56% $147,551,907 $2,007,214,843 7.35%
17 MN 36,438 211,025 17.27% $134,093,065 $877,849,500 15.28%
18 KY 36,002 738,765 4.87% $67,310,457 $1,953,214,169 3.45%

RANK STATE TYs 1997-2001 ESF WAGE ITEMS TYs 1997-2001 ESF WAGES
SUSPENDED WAGE ITEMS REPORTED
WAGE ITEMS SUSPENDED ITEMS
AS PERCENT
REPORTED ITEMS SUSPENDED WAGES REPORTED WAGES SUSPENDED WAGES AS A PERCENT OF REPORTED WAGES

Exhibit 1 Page 10

19 CA 34,521 91,383 37.78% $74,307,690 $225,371,469 32.97%
20 CA 33,016 44,330 74.48% $50,000,341 $84,465,712 59.20%
21 TX 32,808 172,585 19.01% $156,643,844 $1,067,378,798 14.68%
22 IL 32,264 49,180 65.60% $85,954,651 $121,477,291 70.76%
23 TX 32,189 125,629 25.62% $165,256,150 $775,225,403 21.32%
24 CA 31,171 55,967 55.70% $54,497,262 $119,982,663 45.42%
25 OH 30,592 249,481 12.26% $127,561,745 $1,185,613,393 10.76%
26 OH 28,317 181,790 15.58% $108,638,471 $796,052,266 13.65%
27 TX 27,691 151,985 18.22% $128,225,077 $892,156,521 14.37%
28 NJ 27,477 57,264 47.98% $32,499,346 $65,336,355 49.74%
29 CA 27,283 39,100 69.78% $27,833,987 $43,537,978 63.93%
30 IL 27,229 48,157 56.54% $42,931,023 $64,346,640 66.72%
31 CA 27,018 44,170 61.17% $38,311,364 $77,903,387 49.18%
32 IL 26,765 45,128 59.31% $46,234,639 $72,645,670 63.64%
33 TX 25,327 97,525 25.97% $59,367,779 $241,128,563 24.62%
34 TN 25,300 572,229 4.42% $106,005,077 $2,325,217,499 4.56%
35 MN 25,292 1,851,420 1.37% $134,128,618 $13,050,799,269 1.03%
36 LA 25,175 164,887 15.27% $92,689,698 $1,386,988,524 6.68%
37 UT 24,827 435,698 5.70% $67,498,582 $897,669,216 7.52%
38 AR 24,780 5,402,408 0.46% $92,649,911 $66,317,739,626 0.14%
39 MI 24,734 2,923,056 0.85% $110,868,849 $19,303,859,259 0.57%
40 TX 24,363 203,148 11.99% $69,517,833 $709,268,403 9.80%
41 FL 24,071 36,100 66.68% $71,614,446 $162,686,812 44.02%
42 MN 22,105 77,466 28.54% $94,243,226 $358,551,597 26.28%
43 TX 22,039 125,792 17.52% $33,503,735 $171,666,996 19.52%
44 IL 22,016 63,342 34.76% $51,471,182 $106,569,395 48.30%
45 KS 21,843 96,681 22.59% $113,278,658 $583,765,393 19.40%
46 CA 21,840 1,704,612 1.28% $56,996,483 $4,939,817,412 1.15%
47 FL 21,565 26,589 81.10% $58,506,183 $81,369,797 71.90%

RANK STATE TYs 1997-2001 ESF WAGE ITEMS TYs 1997-2001 ESF WAGES
SUSPENDED WAGE ITEMS REPORTED
WAGE ITEMS SUSPENDED ITEMS
AS PERCENT
REPORTED ITEMS SUSPENDED WAGES REPORTED WAGES SUSPENDED WAGES AS A
PERCENT OF REPORTED WAGES
48 CA 21,434 69,801 30.71% $86,028,370 $297,523,822 28.91%
49 WI 21,338 306,933 6.95% $76,072,109 $1,266,839,399 6.00%
50 CA 21,131 28,495 74.16% $29,708,493 $43,729,831 67.94%
51 CA 20,942 31,441 66.61% $30,295,464 $50,710,962 59.74%
52 GA 20,793 52,766 39.41% $113,532,115 $440,624,450 25.77%
53 IL 20,743 28,784 72.06% $43,087,003 $51,785,583 83.20%
54 CA 20,538 48,062 42.73% $104,880,153 $341,597,132 30.70%
55 TX 20,074 40,643 49.39% $33,209,528 $52,444,376 63.32%
56 SC 19,573 325,503 6.01% $65,283,165 $890,684,834 7.33%
57 CA 19,230 29,618 64.93% $53,804,244 $93,379,479 57.62%
58 CA 19,193 68,891 27.86% $95,525,517 $338,892,248 28.19%
59 NE 18,852 572,610 3.29% $197,524,222 $10,190,535,407 1.94%
60 IA 18,311 29,810 61.43% $112,317,486 $190,915,072 58.83%
61 TX 18,231 224,823 8.11% $88,328,269 $550,553,331 16.04%
62 OR 18,228 249,328 7.31% $68,088,754 $1,206,511,726 5.64%

Exhibit 1 Page 11

63 IL 17,619 75,934 23.20% $106,111,838 $512,961,361 20.69%
64 WA 17,560 26,511 66.24% $30,271,870 $57,705,452 52.46%
65 GA 17,483 186,864 9.36% $87,697,567 $699,192,720 12.54%
66 OH 17,208 29,244 58.84% $31,554,686 $45,284,480 69.68%
67 TX 17,173 189,580 9.06% $88,591,505 $821,726,171 10.78%
68 CA 17,084 22,202 76.95% $37,128,171 $55,914,654 66.40%
69 CA 17,075 52,010 32.83% $70,441,404 $224,983,732 31.31%
70 CA 16,627 289,309 5.75% $46,958,992 $795,669,604 5.90%
71 TX 16,378 97,089 16.87% $178,348,327 $1,299,143,399 13.73%
72 NY 16,358 575,812 2.84% $69,413,980 $4,207,135,059 1.65%
73 IL 16,036 22,196 72.25% $28,469,976 $37,691,291 75.53%
74 AZ 15,983 44,092 36.25% $26,651,514 $74,839,982 35.61%
75 TN 15,982 300,603 5.32% $70,641,087 $1,133,336,167 6.23%
76 TX 15,368 88,829 17.30% $43,302,291 $191,461,709 22.62%
77 CO 15,162 136,473 11.11% $65,223,596 $609,410,678 10.70%

RANK STATE TYs 1997-2001 ESF WAGE ITEMS TYs 1997-2001 ESF WAGES
SUSPENDED WAGE ITEMS REPORTED
WAGE ITEMS SUSPENDED ITEMS
AS PERCENT
REPORTED ITEMS SUSPENDED WAGES REPORTED WAGES SUSPENDED WAGES AS A
PERCENT OF REPORTED WAGES
78 NC 14,838 142,574 10.41% $51,128,279 $444,079,652 11.51%
79 IL 14,837 169,216 8.77% $45,186,039 $332,182,151 13.60%
80 OH 14,663 363,370 4.04% $56,211,919 $1,420,890,805 3.96%
81 TX 14,427 57,732 24.99% $32,085,397 $194,829,259 16.47%
82 WA 14,091 19,188 73.44% $62,417,898 $95,377,435 65.44%
83 IL 14,084 151,718 9.28% $42,230,961 $454,119,213 9.30%
84 KY 13,995 99,378 14.08% $66,956,795 $403,722,642 16.58%
85 FL 13,885 226,478 6.13% $40,574,714 $1,035,839,885 3.92%
86 AZ 13,884 47,377 29.31% $20,808,702 $87,733,844 23.72%
87 IL 13,783 17,701 77.87% $39,330,630 $51,017,775 77.09%
88 TX 13,557 70,838 19.14% $47,308,192 $423,719,604 11.16%
89 CA 13,300 17,865 74.45% $14,288,211 $20,433,897 69.92%
90 KS 13,287 66,128 20.09% $47,981,007 $333,377,827 14.39%
91 IL 13,276 23,847 55.67% $27,571,231 $43,950,856 62.73%
92 CA 13,247 30,304 43.71% $61,045,644 $179,984,258 33.92%
93 TX 13,240 332,336 3.98% $36,501,214 $834,034,845 4.38%
94 WI 13,237 1,175,323 1.13% $41,946,282 $3,752,404,573 1.12%
95 NJ 13,214 242,652 5.45% $86,788,484 $2,865,070,097 3.03%
96 CA 13,184 67,266 19.60% $91,567,382 $463,255,984 19.77%
97 IL 13,137 20,457 64.22% $21,518,488 $38,221,253 56.30%
98 CA 13,063 17,704 73.79% $29,606,997 $45,380,211 65.24%
99 CA 12,993 22,988 56.52% $13,135,799 $32,267,508 40.71%
100 IL 12,951 301,071 4.30% $72,301,907 $2,553,107,310 2.83%
Totals 2,728,362 35,539,356 7.68% $9,570,929,156 $205,939,044,856 4.65%

Appendix E
Alphabetical Listing Top 100 Employers by State

State Number of

Exhibit 1 Page 12

Employers Total Suspended
Wage Items Total Suspended Wages
ARIZONA 2 29,867 $47,460,216
ARKANSAS 1 24,780 $92,649,911
CALIFORNIA 25 682,506 $1,992,526,035
COLORADO 1 15,162 $65,223,596
FLORIDA 4 165,594 $420,648,214
GEORGIA 3 84,025 $352,544,591
ILLINOIS 14 376,731 $1,177,333,106
IOWA 1 18,311 $112,317,486
KANSAS 2 35,130 $161,259,665
KENTUCKY 3 100,452 $360,311,159
LOUISIANA 1 25,175 $92,689,698
MICHIGAN 2 81,439 $286,958,774
MINNESOTA 3 83,835 $362,464,910
NORTH CAROLNA 1 14,838 $51,128,279
NEBRASKA 1 18,852 $197,524,222
NEW JERSEY 3 77,993 $169,914,341
NEW MEXICO 1 36,455 $147,551,907
NEW YORK 2 102,601 $536,922,065
OHIO 4 90,780 $323,966,821
OKLAHOMA 1 43,375 $117,983,189
OREGON 1 18,228 $68,088,754
SOUTH CAROLINA 2 68,731 $285,456,146
TENNESSEE 2 41,282 $176,646,164
TEXAS 15 401,167 $1,693,153,169
UTAH 1 24,827 $67,498,582
WASHINGTON 2 31,651 $92,689,767
WISCONSIN 2 34,575 $118,018,390
TOTALS 100 2,728,362 $9,570,929,156

Note: For each of the Top 100 employers, we used the employer mailing address related to the Employer Identification Number (EIN). The EIN is a 9-digit number assigned by the IRS to sole proprietors, corporations, partnerships, estates, trusts, and other entities for tax filing and reporting purposes. This address may relate more to payroll issues than the physical location where an employer does most of its business.

Appendix F
Earnings Data Warehouse

The Social Security Administration (SSA) has developed the Earnings Data Warehouse (EDW), a management information system to assist tracking employer wage reporting. Users include the following SSA components:

• Office of Central Operations;
• Wilkes-Barre Data Operations Center;
• Deputy Commissioner for Finance, Assessment and Management; and
• Employer Service Liaison Officers.

The EDW is a relational database system using online processing tools to access different views of earnings data. The EDW provides historical and trend data to assist components:

Exhibit 1 Page 13

- Analyze corrective actions and errors;
- Analyze wage reporting data received by SSA;
- Support the electronic filing initiative, marketing efforts, and outreach programs; and
- Manage their workload.

The management information data stored in the EDW is based on the detailed data housed in the Earnings Management Information Operations Data Store.

The EDW is being implemented in two phases. Currently, EDW is in phase one, which is the submission level. At this level, EDW contains information about the companies that submit data such as the number of Wage and Tax Statements (Form W-2). The next phase, the employer level, is expected to be available in 2004 and will contain information from Tax Year 1998 forward. The employer level will contain additional information about the individual employers, including addresses, the type of media used to report earnings information, incorrect Social Security numbers (SSN), invalid SSNs, young children's earnings, earnings after death, and various statistical data.

Appendix G
Status of Internal Revenue Service Efforts to Monitor Employers

Title II of the Social Security Act requires the Social Security Administration (SSA) to maintain records of wages employers pay to employees, but does not give SSA the authority to enforce accurate wage reporting. The Internal Revenue Service (IRS) has that authority through its power to levy monetary penalties. The Internal Revenue Code allows the Agency to penalize an employer if it fails to file a complete and accurate wage reporting form. The penalty is $50 per incorrect form, with a $250,000 annual limit. For businesses with average receipts of not more than $5 million, the limit is $100,000 yearly. To date, the IRS has yet to assess monetary penalties against employers filing inaccurate Wage and Tax Statements (Form W-2).

In recent congressional testimony, the IRS Commissioner noted that his Agency reviewed the records of employers who had submitted a large number of wage items to SSA's Earnings Suspense File (ESF). In his testimony, the Commissioner stated that employers are required to exercise due diligence in collecting an employee's Social Security number (SSN) and obtaining information from an employee on an Employee's Withholding Allowance Certificate (Form W-4). Employers can, but are not required to, ask for proof of the SSN reported on form W-4 and validate the SSN using SSA's Employee Verification Service (EVS).

The IRS also conducted compliance checks of 78 employers. These 78 employers were selected from a list of employers provided by SSA that had the highest volume and/or highest percentage of W-2s that did not match SSA's records. Of these 78 employers, 50 were large employers with a high number of ESF items. The IRS concluded all 50 of these employers had programs and processes for obtaining information for Forms W-4 and using the information in preparing individuals' W-2s. These employers also had processes in place for re-soliciting required information upon receipt of a no-match letter from SSA. Based on the IRS's analysis, no penalty potential was identified for these 50 employers.

The remaining 28 of the 78 employers were smaller companies, generally issuing less than 1,000 W-2s but with error rates of 93 percent and above. The IRS analysis showed that these employers frequently used day labor and had high employee turnover. Like the larger employers, the smaller companies obtained W-4s, used the W 4 information to prepare W-2s, and attempted to correct information upon receipt of a no-match letter from SSA. The IRS analysis concluded that there was no potential for penalties for these employers.

Exhibit 1 Page 14

Appendix H
Prior Office of the Inspector General Reports

Social Security Administration, Office of the Inspector General
Reports Related to the Earnings Suspense File
Common
Identification
Number
Report Title
Date
Issued
A-03-02-22076 Utility of Older Reinstated Wages from the Earning Suspense File December 2003
A-03-03-13026 Follow-up Review of Employers with the Most Suspended Wage Items October 2003
A-03-03-24048 Congressional Response Report: Use and Misuse of the Social Security Number August 2003
A-03-03-13017 Congressional Response Report: Review of the Social Security Number Feedback Pilot Project April 2003
A-03-03-23038 Congressional Response Report: Status of the Social Security Administration's Earnings Suspense File November 2002
A-03-02-22008 The Social Security Administration's Employee Verification Service for Registered Employers September 2002
A-03-01-11035 Effectiveness of the Social Security Administration's Earnings After Death Process August 2002
A-03-01-11034 Effectiveness of the Social Security Administration's Decentralized Correspondence Process July 2002
A-03-01-30035 Management Advisory Report: Recent Efforts to Reduce the Size and Growth of the Social Security Administration's Earnings Suspense File May 2002
A-03-00-10022 Management Advisory Report: Review of Service Industry Employer with Wage Reporting Problems September 2001
A-03-99-31001 Force Processing of Magnetic Media Wage Reports with Validation Problems May 2001
A-08-99-41004 Obstacles to Reducing Social Security Number Misuse in the Agricultural Industry January 2001
A-03-97-31003 The Social Security Administration's Earning Suspense Tactical Plan and Efforts to Reduce the File's Growth and Size February 2000
A-03-98-31009 Patterns of Reporting Errors and Irregularities by 100 Employers with the Most Suspended Wage Items September 1999


Appendix I
Agency Comments

MEMORANDUM 33240-24-1137

Date: October 14, 2004
Refer To: S1J-3

To: Patrick P. O'Carroll, Jr.
Acting Inspector General

From: Larry W. Dye /s/

Exhibit 1 Page 15

Chief of Staff

Subject: Office of the Inspector General (OIG) Draft Report, "Employers with the Most Suspended Wage Items in the 5-Year Period 1997 through 2001" (A-03-03-13048)--INFORMATION

We appreciate OIG's efforts in conducting this review. Our comments to the recommendations are attached.

Please let us know if we can be of further assistance. Staff questions may be referred to Candace Skurnik at extension 54636.

Attachment:
SSA Response


COMMENTS ON THE OFFICE OF THE INSPECTOR GENERAL (OIG) DRAFT REPORT, "EMPLOYERS WITH THE MOST SUSPENDED WAGE ITEMS IN THE 5 YEAR PERIOD 1997 THROUGH 2001" A-03-03-13048

We appreciate the opportunity to comment on the draft report. For some time now, we have been engaged in a variety of activities geared to reducing the growth and size of the Earnings Suspense File (ESF). As the ESF continues to grow in both real and relative terms, we maintain a focus on educating employers about proper wage reporting techniques through our Employer Service Liaison Officers (ESLO) in each region. In the past, we have been commended for our efforts in reducing the size and growth of the ESF (OIG Congressional Response Report, "Status of Social Security Administration's Earnings Suspense File" A-03-03-23038).

Our comments to the recommendations and technical comments to the report are below.

Recommendation 1

Create centralized Earnings Data Warehouse (EDW) reports, after considering ESLO input, that assist ESLOs with identifying problematic employer reporting trends, such as increases in the volume of wage items in suspense as well as the percent of an employer's payroll in the ESF.
Comment

We partially agree. We will work with each ESLO in determining their individual reporting needs and requirements, including the method of delivery.

EDW currently has the report capabilities to identify employers with large numbers of items on the ESF or larger percentages of W-2 data on the ESF. As for identifying specific employer payroll percentage calculations of incorrect wage items as compared to correct wage items, the Annual Wage Reporting (AWR) system, which is the source of the Earnings Management Information Operational Data Store (EMODS) and EDW data, would have to pass on the total number of accurate W2's posted to the Master Earnings File. AWR currently does not provide this information and would require systems modifications to allow EMODS to calculate this measure, and would require approval for resources from the Agency's Information Technology Advisory Board.

Recommendation 2

Exhibit 1 Page 16

Ensure ESLOs consider employer reporting trends created by EDW as part of their criteria in identifying employers for assistance through periodic monitoring from Headquarters.

Comment

We partially agree. We will utilize the EDW to identify those employers who are determined to need our assistance in the wage reporting arena. The ESLOs in each region will continue to provide the employer community with wage reporting educational seminars and any needed individual attention. In addition, we will continue to partner with the regional ESLOs in monitoring and implementing changes to address the Agency's ESF goals, but not directly monitor the ESLOs from Headquarters.

[In addition to the items listed above, SSA also provided technical comments which have been addressed, where appropriate, in this report.]


Appendix J
OIG Contacts and Staff Acknowledgments

OIG Contacts

Walter Bayer, Director, Mid-Atlantic Audit Division, (215) 597-4080

Cylinda McCloud-Keal, Audit Manager, (215) 597-0572

Acknowledgments

In addition to those named above:

Michael Thomson, Auditor-in-Charge

Richard Devers, Computer Specialist

For additional copies of this report, please visit our web site at www.socialsecurity.gov/oig or contact the Office of the Inspector General's Public Affairs Specialist at (410) 965-3218. Refer to Common Identification Number A 03 03 13048.

DISTRIBUTION SCHEDULE

Commissioner of Social Security
Office of Management and Budget, Income Maintenance Branch
Chairman and Ranking Member, Committee on Ways and Means
Chief of Staff, Committee on Ways and Means
Chairman and Ranking Minority Member, Subcommittee on Social Security
Majority and Minority Staff Director, Subcommittee on Social Security
Chairman and Ranking Minority Member, Subcommittee on Human Resources
Chairman and Ranking Minority Member, Committee on Budget, House of Representatives
Chairman and Ranking Minority Member, Committee on Government Reform and Oversight
Chairman and Ranking Minority Member, Committee on Governmental Affairs
Chairman and Ranking Minority Member, Committee on Appropriations, House of Representatives
Chairman and Ranking Minority, Subcommittee on Labor, Health and Human Services, Education and

Exhibit 1 Page 17

Related Agencies, Committee on Appropriations,
House of Representatives
Chairman and Ranking Minority Member, Committee on Appropriations, U.S. Senate
Chairman and Ranking Minority Member, Subcommittee on Labor, Health and Human Services,
Education and Related Agencies, Committee on Appropriations, U.S. Senate
Chairman and Ranking Minority Member, Committee on Finance
Chairman and Ranking Minority Member, Subcommittee on Social Security and Family Policy
Chairman and Ranking Minority Member, Senate Special Committee on Aging
Social Security Advisory Board
Overview of the Office of the Inspector General

The Office of the Inspector General (OIG) is comprised of our Office of Investigations (OI), Office of
Audit (OA), Office of the Chief Counsel to the Inspector General (OCCIG), and Office of Executive
Operations (OEO). To ensure compliance with policies and procedures, internal controls, and
professional standards, we also have a comprehensive Professional Responsibility and Quality
Assurance program.
Office of Audit
OA conducts and/or supervises financial and performance audits of the Social Security Administration's
(SSA) programs and operations and makes recommendations to ensure program objectives are achieved
effectively and efficiently. Financial audits assess whether SSA's financial statements fairly present
SSA's financial position, results of operations, and cash flow. Performance audits review the economy,
efficiency, and effectiveness of SSA's programs and operations. OA also conducts short-term
management and program evaluations and projects on issues of concern to SSA, Congress, and the
general public.

Office of Investigations
OI conducts and coordinates investigative activity related to fraud, waste, abuse, and mismanagement in
SSA programs and operations. This includes wrongdoing by applicants, beneficiaries, contractors, third
parties, or SSA employees performing their official duties. This office serves as OIG liaison to the
Department of Justice on all matters relating to the investigations of SSA programs and personnel. OI
also conducts joint investigations with other Federal, State, and local law enforcement agencies.

Office of the Chief Counsel to the Inspector General
OCCIG provides independent legal advice and counsel to the IG on various matters, including statutes,
regulations, legislation, and policy directives. OCCIG also advises the IG on investigative procedures
and techniques, as well as on legal implications and conclusions to be drawn from audit and
investigative material. Finally, OCCIG administers the Civil Monetary Penalty program.
Office of Executive Operations
OEO supports OIG by providing information resource management and systems security. OEO also
coordinates OIG's budget, procurement, telecommunications, facilities, and human resources. In
addition, OEO is the focal point for OIG's strategic planning function and the development and
implementation of performance measures required by the Government Performance and Results Act of
1993.

Exhibit 1 Page 18